VIRGINIA: IN THE CIRCUIT COURT FOR THE COUNTY OF KING WILLIAM

PETER VLAMING,

                                        *Plaintiff,*

                    v.

                                                    CASE NO. _CL19-454_

WEST POINT SCHOOL BOARD;

        SERVE:      West Point School Board
                    1626 Main St.
                    West Point, VA 23181

LAURA ABEL, in her official capacity as Division
Superintendent;

        SERVE:      Laura Abel
                    1626 Main St.
                    West Point, VA 23181

JONATHAN HOCHMAN, in his official capacity as
Principal of West Point High School;

        SERVE:      Jonathan Hochman
                    2700 Mattaponi Ave.
                    West Point, VA 23181

SUZANNE AUNSPACH, OR HER SUCCESSOR IN
OFFICE, in her official capacity as Assistant
Principal of West Point High School;

        SERVE:      Suzanne Aunspach
                    2700 Mattaponi Ave.
                    West Point, VA 23181

                    *Defendants.*

**COMPLAINT FOR
DECLARATORY, INJUNCTIVE,
AND ADDITIONAL RELIEF**

**Plaintiff Demands a Jury Trial**

King William
Circuit Court

SEP 27 2019

Filed/Received
Patricia Norman Clerk

---

        Plaintiff, Peter Vlaming, by and through counsel, and for his Complaint

states as follows.

## INTRODUCTION

        1.      Last December, a group of students at West Point High School staged a

walkout to protest the firing of their beloved French language teacher, Peter

Vlaming, which had occurred the day before. Why was Mr. Vlaming fired? Because

he exercised his right to free speech. But he wasn't fired for something he said. He was fired for what he didn't say.

2.    The facts giving rise to this Complaint began when one of Mr. Vlaming's female students began to identify as male. Mr. Vlaming did everything he could to accommodate this student. He used the student's preferred (traditionally male) name, while avoiding the use of pronouns altogether. Eventually, the school administration learned about Mr. Vlaming's efforts to respect this student while also respecting his own conscience. Unsatisfied, the school administration demanded that Mr. Vlaming use male pronouns when addressing or referring to this biologically female student—even when this student was not present. They demanded that he speak specific words.

3.    Defendants gave Mr. Vlaming an ultimatum: Use male pronouns for this female student or lose your job.

4.    Mr. Vlaming could not violate his conscience. And it cost him his job.

5.    Defendants did not have any written policy regarding using pronouns. It's not part of a teacher's job description. Instead, Defendants made up an uncompromising interpretation of their policies to compel Mr. Vlaming to take sides in an ongoing public debate regarding gender dysphoria and use pronouns that express an objectively untrue ideological message.

6.    But this case is about far more than pronouns. It is about whether the government may force Mr. Vlaming to express ideas about human nature, unrelated to the school's curriculum, that he believes are false. If he were to comply with Defendants' demands, he would be forced to communicate that gender identity, rather than biological reality, fundamentally shapes and defines who we truly are as humans, that our sex can change, and that a woman who identifies as a man *really is* a man. But if he refers to students based on their biological sex (as he has, with reasonable accommodations), he communicates the views he actually

believes—that our sex shapes who we are as humans, that this sex is fixed in each person, and that it cannot be changed, regardless of our feelings or desires.

7.     This is not the type of philosophical disagreement in which the government may compel individuals to take sides. Whether the topic is immigration, healthcare, welfare, or no-cost higher education, our society debates important issues every day. It is not harassment to disagree about these issues or to voice that disagreement. A truly tolerant society can permit such differences and accommodate all views. But here, Defendants have refused to find middle ground. They have made this case about far more than titles or pronouns; they have made it about dueling views of human nature and compelling conformity to, and support for, only one view. Under the timeless free speech principles enshrined in the Virginia Constitution and laws, Defendants cannot compel one side to voice the other's beliefs.

8.     This is a civil rights action under the Constitution and laws of the Commonwealth of Virginia. Defendants violated the Virginia Constitution and laws of the Commonwealth by firing Mr. Vlaming for exercising his rights to free speech and free exercise.

## PARTIES

9.     Peter Vlaming is a resident of Williamsburg, Virginia.

10.    Mr. Vlaming was employed by the West Point School Board as a high school French teacher, among other positions, from 2012 until December 6, 2018.

11.    Defendant West Point School Board is the public body that governs West Point Public Schools and is located in King William County, Virginia.

12.    The School Board derives its authority from the Commonwealth of Virginia and acts under the authority of the Commonwealth of Virginia.

13.    The School Board has final policymaking authority for rules and regulations that govern school division personnel, including the policies challenged herein.

14.    The School Board exercised its authority to suspend and then fire Mr. Vlaming for exercising his rights protected under the Virginia Constitution and statutes.

15.    Defendant Laura Abel is the Superintendent of West Point School Division.

16.    The Superintendent is responsible for interpretation and enforcement of the policies challenged herein.

17.    The Superintendent suspended Mr. Vlaming and recommended that Mr. Vlaming be fired for exercising his rights protected under the Virginia Constitution and statutes.

18.    Defendant Jonathan Hochman is the Principal of West Point High School.

19.    The Principal is responsible for interpretation and enforcement of the policies challenged herein.

20.    The Principal exercised his authority to order Mr. Vlaming to speak an ideological message and recommend his suspension for exercising his rights protected under the Virginia Constitution and statutes.

21.    Defendant Suzanne Aunspach is, or was at all times relevant to the facts giving rise to this Complaint, the Assistant Principal at West Point High School.

22.    The Assistant Principal is responsible for interpretation and enforcement of the policies challenged herein.

23.    The Assistant Principal exercised her authority to order Mr. Vlaming to speak an ideological message and threatened his job for exercising his rights under the Virginia Constitution and statutes.

## JURISDICTION AND VENUE

24.    This Court has personal and subject matter jurisdiction under Va. Code §§ 8.01–328.1, 17.1–513.

25.    This Court has authority to issue the relief sought under Va. Code §§ 8.01–184–190 (declaratory judgment, damages, costs, and attorneys' fees), 8.01–620–633 (injunctive relief, damages, and costs), and 57–2.02 (declaratory judgment, injunctive relief, costs, attorneys' fees).

26.    Venue is proper in this judicial circuit under Va. Code §8.01–261 because the petition is brought in the Circuit Court of the county where the acts giving rise to this Complaint took place and because Defendants have their place of business in this circuit.

## FACTS
### Peter Vlaming's Contributions to the West Point Community

27.    In 2012, Peter Vlaming accepted a position at West Point High School ("WPHS") as the school's French teacher.

28.    Mr. Vlaming became an integral part of the WPHS staff.

29.    He served on the Professional Learning Steering Committee, coached WPHS' first girls' soccer team, started the Rotary Interact Service Club, looked into starting a wrestling team, sponsored the French National Honor Society, taught the school's first Career Investigations class, managed the Sunshine Fund for staff who are celebrating important life events or are grieving, and drove a school bus.

30.    Mr. Vlaming was unanimously granted continuing contract status by the School Board on or about March 22, 2017. A true and accurate copy of that contract is attached to this Complaint as Exhibit 1.

31.    While teaching, Mr. Vlaming was also pursuing a master's degree in school administration at the College of William and Mary, which was conferred on August 23, 2019.

32.    During his time at WPHS, Mr. Vlaming received only positive feedback in teacher evaluations and was honored at the 2018 convocation for exemplary attendance.

### Peter Vlaming accommodates a student's special requests

33.    Near the end of the 2017–18 school year, Mr. Vlaming became aware that one of his French I students, a female, was planning to begin identifying as a male.

34.    This student had been in Mr. Vlaming's Exploratory French Class from 2016–2017 and his French I class from 2017–2018, and would be taking his French II class in the Fall of 2018.

35.    Mr. Vlaming enjoyed having the student in his class due to her grasp of the topic and her sense of humor.

36.    During the summer of 2018, Mr. Vlaming discussed the situation with his former professor and former superintendent of schools in Virginia, Dr. Steven Staples.

37.    The student is objectively female.

38.    The student subjectively identifies as male.

39.    Dr. Staples recommended that Mr. Vlaming speak with the student's parents to better understand the situation.

40.    Following Dr. Staples' advice, Mr. Vlaming met with the student, her mother, and a Guidance Counselor to gain clarification and understanding regarding the parent's perspective and expectations.

41.     Mr. Vlaming led the discussion with questions and reflections on positive experiences with students in the past. The parent explained the student's transition, struggles, and provided an update on the student's sibling.

42.     At the beginning of the year in every French Class, Mr. Vlaming has each student pick a French name, different than their given name, that he will use for that class and any subsequent French class in which that student enrolls with Mr. Vlaming.

43.     Mr. Vlaming became aware that the student desired to be called by a more culturally masculine name instead of her culturally female names (both her given and French names).

44.     To avoid drawing unwanted attention to the student, Mr. Vlaming, of his own accord, allowed his entire French II class to pick new French names for the semester (even though each student had already chosen a French name in French I) so that the student would not be the only one changing names.

45.     Mr. Vlaming also informed the Assistant Principal that he had met with the student and her mother to gain a better understanding of the situation and his role.

46.     From the beginning of the school year, Mr. Vlaming referred to the student by her new preferred names (both French and English)—even though it had not yet been legally changed.

47.     Mr. Vlaming did not ever intentionally use female pronouns to refer to the student when in her presence after meeting with her and her mother.

48.     Mr. Vlaming also rarely, if ever, used third person pronouns to refer to any students during class or while the student being referred to was present.

49.     In class discussion, if Mr. Vlaming refers to a student, or their work, it is rare that he uses a pronoun. Rather he would say, for example, "What do you think about John's answer?" or, "Was John's answer correct?"

50.    If he ever uses a pronoun, he always uses the pronoun that corresponds with the student's biological sex.

51.    On September 11, 2018, after several weeks of classes, the Assistant Principal met with the student and asked how things were going with the transition. The student responded that everything was going "fine."

52.    On Sunday, October 21, 2018, the student asked Mr. Vlaming via email if they could meet and discuss "something important." Mr. Vlaming agreed and suggested they meet Monday at the beginning of 8th period.

53.    Mr. Vlaming was not aware of the reason for the requested meeting.

54.    On October 22, 2018, Mr. Vlaming met with the student per her request.

55.    The student explained that she had been told by others that when she was not present, he had referred to her using the female pronoun.

56.    Mr. Vlaming explained that that he was trying to honor her wishes by using her new preferred name and, in accordance with her wishes, would not use the female pronoun to refer to her when she was present.

57.    He asked the student to extend him some grace regarding attempting to accommodate her new preferences.

58.    During the meeting, the student did not take issue with, or mention at all, Mr. Vlaming's practice of not using pronouns in class.

59.    The meeting ended on a good note, and the student seemed to be satisfied and comfortable with the situation.

60.    That afternoon, Mr. Vlaming called the student's parent as a professional courtesy, due to the situation's delicate nature.

61.    The student's parent stated that the student had thought the meeting had gone well.

62.    Mr. Vlaming explained his pleasure having the student in class and his appreciation of the student's humor, wit, and intelligence.

63.    When the topic of name and pronoun usage came up, Mr. Vlaming stated that he respected the student's and her family's choices, would continue to call the student by her preferred name, and would avoid referring to her with female pronouns in class since pronouns are rarely, if ever, used to refer to a student in class.

64.    The student's parent responded that Mr. Vlaming should leave his principles and beliefs out of this and refer to the student as a male.

### Defendants refuse any reasonable accommodation

65.    On October 23, 2018, the next day, Mr. Vlaming asked to meet first thing in the morning with the Assistant Principal to make her aware of the conversation with the parent.

66.    The Principal was out on vacation.

67.    During their meeting, Mr. Vlaming explained his meeting with the student, and his conversation with the parent.

68.    Mr. Vlaming also asked the Principal to call him. The Principal did so.

69.    After hearing the situation, the Principal instructed Mr. Vlaming to "do whatever the parents ask."

70.    On October 24, 2018, the Assistant Principal met with Mr. Vlaming in the early morning. She told Mr. Vlaming that the student preferred to be referred to by male pronouns.

71.    The Assistant Principal also gave Mr. Vlaming two documents published by the National Center for Transgender Equality (NCTE) regarding protocol with transgender students. A true and accurate copy of the first document, "Transgender Student Rights: The Basics," is attached as Exhibit 2. A true and accurate copy of the second document, "Fact Sheet," is attached as Exhibit 3.

72.   The Assistant Principal told Mr. Vlaming that it was potentially violating federal law and School Board policy to not use male pronouns to refer to a female student.

73.   The Assistant Principal told Mr. Vlaming that he should be aware of the law.

74.   The documents the Assistant Principal gave Mr. Vlaming were from a political advocacy organization and were based on a guidance letter from the Department of Justice and Department of Education that had since been repealed.

75.   In fact, the Department of Justice and Department of Education withdrew the guidance letter that was the basis for the documents on February 22, 2017—over a year and a half before Mr. Vlaming met with the Assistant Principal.

76.   The documents the Assistant Principal gave Mr. Vlaming appeared to have been altered to remove the portion noting that the Department of Justice guidance letter had been revoked.

77.   Mr. Vlaming explained to the Assistant Principal that he had been accommodating the student by using her new preferred name and that he did not refer to the student in question with female pronouns in class.

78.   The Assistant Principal stated that his non-use of pronouns was not enough: that he should use male pronouns or his job could be at risk.

79.   Mr. Vlaming responded that using male pronouns to refer to a female was against his religious beliefs.

80.   Mr. Vlaming believes both as a matter of human anatomy and religious conviction that sex is biologically fixed in each person and cannot be changed regardless of a person's feelings or desires.

81.   Saying "he," "him," or "his" objectively expresses the message that a person is, or the speaker believes them to be, male.

82.     Saying "she," "her," or "hers" objectively expresses the message that a person is, or the speaker believes them to be, female.

83.     Mr. Vlaming's conscience and religious practice prohibits him from intentionally lying, and he sincerely believes that referring to a female as a male by using an objectively male pronoun is telling a lie.

84.     The Assistant Principal responded that since Mr. Vlaming signed a contract, his "personal religious beliefs end at the school door" when they conflict with the School Board Policy. She did not, however, show him any policy other than the document from the NCTE.

85.     She then stated that his failure to comply could lead to termination of employment.

86.     Mr. Vlaming responded that he hoped it would not come to that.

87.     On October 30, 2018, Mr. Vlaming spoke with the Principal.

88.     During the meeting, Mr. Vlaming stated his desire to not offend the family while also not violating his conscience and belief that he must tell the truth.

89.     It is Mr. Vlaming's sincerely held religious belief that referring to a female as a male is untruthful and prohibited by his faith and conscience.

90.     On information and belief, the Student's parent emailed the Principal before this meeting.

91.     She told the principal that she wanted Mr. Vlaming to use identity-based terms because using these terms would show the student that Mr. Vlaming affirmed and agreed with the student's gender identity.

92.     At the meeting, the Principal told Mr. Vlaming that he must use the student's preferred pronouns in any and every context or Mr. Vlaming could be terminated.

93.     In doing so, the Principal relied on the Parent's advice to interpret and enforce Defendant's policies.

94.    On October 31, 2018, the Principal and Assistant Principal met in the morning with Mr. Vlaming. The Principal explained that Mr. Vlaming must use male pronouns to refer to this female student, and that Mr. Vlaming would receive a letter of reprimand formally charging him with non-conformity with School Board Policy for not using male pronouns for this student.

95.    At this meeting, neither the Principal nor Assistant Principal identified the School Board policy that they alleged Mr. Vlaming was violating.

96.    Later that morning, at about 10:00 a.m., Mr. Vlaming was supervising an activity for his French II class. In the activity, students were divided into pairs. One student wore virtual reality goggles while the second gave directions to prevent the first student from walking into objects.

97.    Mr. Vlaming noticed that the student in question was about to walk into a wall but her partner was not paying attention. He called out, "Don't let her hit the wall!"

98.    Immediately Mr. Vlaming realized that he had inadvertently used the female pronoun and put his hand to his mouth. He then continued to supervise the activity until the end of the class.

99.    After the other students left at the end of class, the student approached Mr. Vlaming and said, "Mr. Vlaming, you may have your religion, but you need to respect who I am."

100.    Mr. Vlaming apologized, saying "I'm sorry, this is difficult," noting that this was an unintentional quick reaction trying to keep her from getting hurt.

101.    Mr. Vlaming immediately went to the Principal to let him know about the incident. The Principal responded, "You know what you do to diffuse a situation like that? You say, 'I'm sorry, I meant to say *him.*'"

102.    Assuming the conversation was over, Mr. Vlaming acknowledged what the Principal said and paused a few seconds before returning to his classroom to begin his 7th period class.

103.    Before this incident, there had been no student reactions or issues in the classroom because of Mr. Vlaming's use of the student's preferred name rather than using a pronoun.

104.    That same day, the student's parent emailed the Principal to inform him that she was withdrawing the student from Mr. Vlaming's class because of the incident and because she had heard he was not using male pronouns to refer to the student when talking with other students or teachers.

105.    The only complaint by the student was regarding the one excited utterance to keep her from hitting the wall and that she heard he was not using male pronouns when referring to her in conversation with others.

106.    This one excited utterance is the only time Mr. Vlaming used the female pronoun to refer to the student in her presence after she announced her intent to socially identify as a male.

107.    The Principal and Assistant Principal called Mr. Vlaming back to the office a few hours after he first reported that day's incident.

108.    The Principal then gave Mr. Vlaming a letter recommending to the Superintendent that Mr. Vlaming be placed on administrative leave pending the outcome of an investigation into his actions. A true and accurate copy of that letter is attached to this Complaint as Exhibit 4.

109.    On the following day, November 1, 2018, the Superintendent suspended Mr. Vlaming.

110.    On November 5, 2018, Mr. Vlaming sent a letter to the Superintendent upon her request explaining the events leading to his suspension. A true and

accurate copy of the November 5, 2018 letter from Mr. Vlaming to Superintendent Abel is attached as Exhibit 5.

111.    On November 6, 2018, Mr. Vlaming reported again to the school board office. The Principal gave Mr. Vlaming a reprimand and final warning letter, which treated his attempted accommodation of the student by avoiding the use of pronouns as a violation of the School Board policy prohibiting harassment or retaliation against students and others on the basis of gender identity. A true and accurate copy of that letter is attached to this Complaint as Exhibit 6.

112.    This was the first time Mr. Vlaming had been advised of the School Board policy he was allegedly violating.

113.    That same day, Mr. Vlaming also met with the Superintendent.

114.    Mr. Vlaming indicated to the Superintendent that he was happy to continue using the student's preferred name but could not in good conscience use male pronouns to refer to a female.

115.    Mr. Vlaming told the Superintendent that using male pronouns to refer to the female student would violate his religious convictions and he could not do it.

116.    On November 7, 2018, Mr. Vlaming met again with the Superintendent, who gave him a written directive. A true and accurate copy of that directive is attached to this Complaint as Exhibit 7.

117.    The directive ordered Mr. Vlaming to "treat [the female student] the same as other male students."

118.    The directive ordered Mr. Vlaming to "use male pronouns" to refer to the female student.

119.    The directive to use male pronouns to refer to a female student was not limited to communication with the student but also included communication to third parties.

120.   The directive to use male pronouns to refer to a female student was not limited to classroom or instructional speech.

121.   The directive stated that Mr. Vlaming would not be permitted to teach again unless he met with the student, her family, and the principal and "assure them that you will treat [the female student] the same as other male students, including using male pronouns . . . ."

122.   The directive further stated that "if you have any further instances of using female pronouns, or of avoiding the use of male pronouns to refer to [the female student], it will be considered insubordination and will result in termination of your employment."

123.   Defendants refused to consider less restrictive alternatives that would accommodate Mr. Vlaming's conscience.

124.   On November 9, 2018, the Superintendent notified Mr. Vlaming that she was recommending the Board terminate his employment and suspended his employment pending the outcome of the recommended dismissal. A true and accurate copy of the November 8, 2018 letter from the Superintendent to Mr. Vlaming is attached as Exhibit 8.

125.   On November 27, 2018, Mr. Vlaming requested a public hearing on his dismissal before the School Board.

126.   On November 28, 2018, Mr. Vlaming was given notice that the hearing would occur on December 6 at 3:00 P.M.

### Defendants applied their policies unconstitutionally and illegally to fire Peter Vlaming

127.   On December 6, 2018, the School Board conducted the hearing and voted unanimously to terminate Mr. Vlaming's employment.

128.   The Board fired Mr. Vlaming in retaliation for his refusal to speak using male pronouns to refer to a female student.

129.   Defendants fired Mr. Vlaming because he would not use a male pronoun to refer to a female student because a pronoun expresses a message about a person's sex.

130.   Many students at West Point High School opposed Defendants' decision to fire Mr. Vlaming because they understood that compelling him to use a male pronoun to refer to a female student would force him to express a message about reality that violated the truth and his conscience.

131.   Students participated in a walkout the day after the Board meeting to protest the Board's decision to fire Mr. Vlaming.

132.   How to respond to individuals with gender dysphoria, or who identify as transgender is a matter of national and local public debate and concern, including whether it is appropriate to treat males as if they are females and vice versa in matters of personal privacy, pronouns, and sports competitions.

133.   Compelling Mr. Vlaming to express that a female is a male by using male pronouns forces him to express a message on that matter of public concern and debate.

134.   If students heard Mr. Vlaming use a male pronoun to refer to a female student they would reasonably understand that Mr. Vlaming was endorsing the idea that a person can change their sex, or that it is appropriate to refer to a female as a male.

135.   On January 2, 2019, Paul E. Diggs, Chairman of the School Board, sent Mr. Vlaming a letter on behalf of the Board stating the alleged basis for firing him. A true and accurate copy of the January 2, 2019 letter from the Chairman to Mr. Vlaming is attached as Exhibit 9.

136.   The letter alleges that Mr. Vlaming was fired for violations of the Board's policies against discrimination and harassment—specifically School Board Policy AC and Policy GBA/JFHA (collectively the "School Board Policies"), and for

not complying with the Superintendent, Principal, and Assistant Principal's directives and interpretations of this policy which were that Mr. Vlaming would be required to use male pronouns to refer to the female student.

137.    Specifically, Mr. Vlaming was fired because the Board determined that by not using male pronouns to refer to the student, Mr. Vlaming violated the Board's policies against discrimination and harassment on the basis of gender identity.

138.    School Board Policy AC states that:

> The West Point School Board is committed to nondiscrimination with regard to race, color, religion, national origin, ancestry, political affiliation, sex, sexual orientation, gender, gender identity, age, marital status, genetic information or disability as defined by law. This commitment will prevail in all division policies and practices concerning staff, students, educational programs and services, and with individuals/entities whom the Board does business.
>
> The Superintendent will develop regulations to ensure non-discriminatory practices and procedures and a process for reporting and investigating any violations should they occur.

A true and accurate copy of this Policy is attached to this Complaint as Exhibit 10.

139.    On information and belief, the School Board voted to add "gender identity" to policy AC on or about October 17, 2017.

140.    On information and belief, the AC Policy did not include "gender identity" prior to October 17, 2017.

141.    On information and belief, at the time Mr. Vlaming was fired, the Superintendent had not developed regulations to ensure non-discriminatory practices and procedures, nor had the Superintendent developed a process for reporting and investigating any violations of the policy.

142.    The AC Policy does not define nondiscrimination.

143.    The AC Policy does not define gender identity.

144.    The AC Policy does not define religion.

145.   On information and belief no other Board policy defines the terms "nondiscrimination," "gender identity," or "religion."

146.   The AC Policy states that it is a "commitment [that] will prevail in all division policies and practices" but does not define the scope of what this phrase actually means.

147.   The AC Policy grants the Superintendent discretion to determine the meaning of the Policy and places no limits on that discretion.

148.   The AC Policy grants the Superintendent discretion to implement the policy and places no limits on that discretion.

149.   The AC Policy grants the Superintendent discretion to *not* implement the policy and places no limits on that discretion.

150.   No part of the AC Policy defines discrimination to include avoiding the use of male pronouns to refer to a biological female, or *vice versa*.

151.   No part of the AC Policy requires teachers to use male pronouns to refer to a biological female, or *vice versa*.

152.   No part of the AC Policy mentions the use of pronouns at all.

153.   No complaint was ever lodged against Mr. Vlaming for an alleged violation of the AC Policy.

154.   The GBA/JFHA Policy states:

Policy Statement

The West Point School Board is committed to maintaining an educational environment and workplace that is free from harassment. In accordance with law, the Board prohibits harassment against students, employees, or others on the basis of sex, gender, race, color, national origin, disability, religion, ancestry, age, marital status, genetic information or any other characteristic protected by law or based on a belief that such characteristic exists at school or any school sponsored activity. The West Point School Board is an equal opportunity employer.

It is a violation of this policy for any student or school personnel to harass a student or school personnel based on race, color, religion, national origin, ancestry, political affiliation, sex, sexual orientation,

gender, gender identity, age, marital status, genetic information or disability as defined by law, or based on a belief that such characteristic exists at school or any school sponsored activity. Further, it is a violation of this policy for any school personnel to tolerate harassment based on a student's or employee's race, color, religion, national origin, ancestry, political affiliation, sex, sexual orientation, gender, gender identity, age, marital status, genetic information or disability as defined by law or based on a belief that such characteristic exists at school or any school sponsored activity, by students, school personnel or third parties participating in, observing or otherwise engaged in school sponsored activities.

For the purpose of this policy, school personnel includes School Board members, school employees, agents, volunteers, contractors or other persons subject to the supervision and control of the school division.

The school division shall promptly:

- investigate all complaints, written or verbal, of harassment based on race, color, religion, national origin, ancestry, political affiliation, sex, sexual orientation, gender, gender identity, age, marital status, genetic information or disability as defined by law or based on a belief that such characteristic exists at school or any school sponsored activity;

- take appropriate action to stop any harassment;

- take appropriate action against any student or school personnel who violates this policy; and

- take any other action reasonably calculated to end and prevent further harassment of school personnel or students.

A true and accurate copy of this Policy is attached to this Complaint as Exhibit 11.

155. The GBA/JFHA Policy defines and gives examples of "harassment based on sex."

156. The GBA/JFHA Policy defines and gives examples of "harassment based on race, national origin, disability or religion."

157. On information and belief, the GBA/JFHA Policy did not include "gender identity" prior to March 20, 2018.

158. On information and belief, the School Board voted to add "gender identity" to Policy GBA/JFHA on or about March 20, 2018.

159.    The GBA/JFHA Policy does not define or give examples of "harassment based on gender identity."

160.    The GBA/JFHA Policy does not define "harassment" in general.

161.    The GBA/JFHA Policy does not define "gender identity."

162.    The GBA/JFHA Policy defines other types of harassment to be limited to "conduct" that "is sufficiently severe, persistent or pervasive to limit a student's or employee's ability to participate in or benefit from the educational program or work environment."

163.    The GBA/JFHA Policy includes a formal complaint, investigation, and appeal process for alleged violations of the policy.

164.    Defendants did not comply with the complaint, investigation, and appeal process when they fired Mr. Vlaming for allegedly violating the policy.

165.    No complaint was ever lodged against Mr. Vlaming for an alleged violation of GBA/JFHA.

166.    The GBA/JFHA Policy includes a process for resolution through mutual agreement of a complainant and person accused.

167.    Defendants never offered to allow Mr. Vlaming to participate in the informal resolution process.

168.    No part of the GBA/JFHA Policy defines harassment to include avoiding the use of male pronouns to refer to a female individual, or *vice versa*.

169.    No part of the GBA/JFHA Policy mandates that teachers use male pronouns to refer to female individuals, or *vice versa*.

170.    No part of the GBA/JFHA Policy mentions the use of pronouns at all.

171.    Not using a male pronoun to refer to a female student when the student is not present is not conduct that is sufficiently severe, persistent or pervasive to limit a student's or employee's ability to participate in or benefit from the educational program or work environment.

172. It is not discriminatory to refer to persons by the pronoun corresponding with their biological sex when one refers to all other person by the pronoun corresponding with their biological sex.

173. It is not discriminatory to avoid using a pronoun that refers to a person's biological sex when they have requested that you not do so.

174. It is not discriminatory to avoid using a pronoun corresponding with a person's biological sex, when that person requests that one do so.

175. It is not harassment to refer to persons by the pronoun corresponding with their biological sex when one refers to all other person by the pronoun corresponding with their biological sex.

176. It is not harassment to avoid using a pronoun corresponding with a person's biological sex, when that person requests that one do so.

177. The use or non-use of a pronoun does not interfere with the efficient functioning of a school.

178. The use or non-use of a pronoun does not constitute prohibited discrimination or harassment because it does not objectively and substantially impair access to education.

179. Using a person's preferred name rather than a pronoun to refer to them does not create a hostile learning environment.

180. Using a person's preferred name rather than a pronoun to refer to them is not discriminatory.

181. Defendants do not have a compelling interest in mandating that Mr. Vlaming use a male pronoun to refer to a female student.

182. Both the GBA/JFHA and the AC Policies use Virginia Code §§ 2.2-3900-3902 as legal references.

183.  Virginia Code §§ 2.2–3900–3902 is referred to as the "Virginia Human Rights Act" and states the "policy of the Commonwealth" with regard to "unlawful discrimination."

184.  Virginia Code §§ 2.2–3900–3902 lists specific protected classes within the Commonwealth, including "race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, age, marital status, or disability."

185.  Virginia Code §§ 2.2–3900–3902 does not list or define "gender identity" as a protected class.

186.  The Virginia Constitution prohibits "governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin," and specifically permits recognition of the inherent biological differences in the two sexes. Va. Const., art. I, § 11.

187.  Virginia Code §15.2–965 prohibits local governmental entities from adopting policies prohibiting discrimination that are "more stringent than any applicable state law prohibiting discrimination in . . . education on the basis of race, color, religion, sex, pregnancy, childbirth or related medical conditions, national origin, age, marital status, or disability."

188.  Virginia Code §15.2-965 does not empower local governmental entities to adopt policies prohibiting discrimination on basis beyond the enumerated protected classes.

189.  On May 22, 2018, in accordance with his continuing contract status, the School Board appointed Mr. Vlaming as a salaried teacher for the 2018-2019 school session.

190.  In accordance with the appointment, Mr. Vlaming and the School Board defendant executed an employment contract on May 22, 2018. A true and accurate copy of that contract is attached to this Complaint as Exhibit 12.

191.  The appointment contract commenced on August 20, 2018.

192.   The contract provided that "the minimum length of this contract shall be 200 days."

193.   The contract provided that Mr. Vlaming would be paid $52,979 in twelve equal monthly installments from September 2018 through August 2019.

194.   The School Board fired Mr. Vlaming on December 6, 2018.

195.   The School Board stopped paying Mr. Vlaming on December 6, 2018.

196.   Under the contract, the School Board was obligated to pay Mr. Vlaming the remainder of the salary installments.

197.   At all times relevant to this matter, Mr. Vlaming fully performed his duties and obligations under the contract.

198.   At all times relevant to this matter, Mr. Vlaming remained ready and willing to continue teaching at West Point High School, but was prevented from doing so by Defendants' actions.

199.   Defendants' actions in firing Mr. Vlaming were arbitrary and capricious.

200.   Defendants' actions in firing Mr. Vlaming were ultra vires because the School Board was not authorized by law to expand its policies to include "Gender Identity."

201.   Defendants' actions in firing Mr. Vlaming were not authorized by the contract.

202.   Defendants' actions in adding gender identity to the School Board's Policies were ultra vires because they were not authorized by law.

203.   Since his termination, Mr. Vlaming has applied for and been turned down for multiple teaching positions because the School Board fired him and accused him of discrimination.

204.   Mr. Vlaming has been told by other school divisions that he is not eligible for consideration for employment because he was fired by the School Board.

205.   As a result of the School Board's actions, Mr. Vlaming has suffered multiple injuries including but not limited to:

    a.  Loss of income of over $25,000 for the remainder of his continuing yearly contract, and continuing loss of income.

    b.  Loss of future income in an amount to be determined at trial.

    c.  Loss of future benefits including access to a pension.

    d.  Loss of reputation.

    e.  Pain, suffering, and emotional distress.

206.   Defendants' actions of threatening Mr. Vlaming and firing him for engaging in constitutionally protected speech would deter a person of ordinary firmness from continuing to engage in protected speech or conduct.

207.   Mr. Vlaming's speech on matters of public concern, including his use or non-use of pronouns, never prevented Defendants from efficiently providing services to the public (or even threatened to do so).

## STATEMENTS OF LAW

208.   At all times relevant to this Complaint, each and all of the acts and policies alleged herein were attributed to Defendants who acted under color of a statute, regulation, or custom of the Commonwealth of Virginia.

209.   Defendants knew or should have known that they were violating Peter Vlaming's constitutional, statutory, and contractual rights, and did violate Mr. Vlaming's constitutional, statutory, and contractual rights by:

    a.  Subjecting Mr. Vlaming to disciplinary action for speaking in a manner that communicates his beliefs regarding gender identity;

    b.  Compelling Mr. Vlaming to speak in a way that affirms and recognizes as true the idea that a person can change his or her biological sex;

    c.  Firing Mr. Vlaming for living and speaking in a manner consistent with the viewpoint that biological sex is fixed and binary;

> d. Refusing to grant Mr. Vlaming a religious accommodation;
>
> e. Implementing policies that were used to fire Mr. Vlaming without legal authority and in violation of the law of Virginia and the Dillon Rule.

210. Compelling Mr. Vlaming to use male pronouns to refer to a female student furthers no compelling governmental interest and is not narrowly tailored to further any compelling governmental interest.

211. Firing Mr. Vlaming or compelling him to speak specific words was not the least restrictive means of furthering Defendants' stated interests.

212. Defendants' actions caused injury to Mr. Vlaming including depriving him of his constitutional and statutory rights, loss of income, loss of future income, loss of future benefits including access to a pension, loss of reputation, and pain, suffering, and emotional distress.

## COUNT I

### Violation of Plaintiff's Right to Freedom of Speech Under the Virginia Constitution: Compelled Speech
### (Va. Const. art. I, § 12)

213. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–212 of this Complaint.

214. Referring to a person using a pronoun that is different than an individual's biological sex communicates a message about gender identity.

215. By firing Mr. Vlaming for refusing to communicate the School's mandated ideological message regarding gender identity, Defendants attempted to compel Mr. Vlaming's speech in violation of his rights under the Virginia Constitution.

216. Defendants' School Board Policies and their enforcement of those policies punished Mr. Vlaming for not communicating a message about gender identity, a message that he does not hold, that he does not wish to communicate, and that conflicts with his religious beliefs and conscience.

217. The discussion of how to respond to individuals with gender dysphoria and whether to alter use of pronouns, or not use pronouns, is a matter of public concern and public debate as defined by the Supreme Court in *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 138 S. Ct. 2448, 2473 (2018).

218. Compelling an individual to express an objective biological falsehood is not a lawful message.

219. The discussion of how to respond to individuals with gender dysphoria and whether to alter use of pronouns is not curricular speech.

220. Using, or not using, pronouns to refer to students is not curricular speech.

221. Using, or not using, pronouns to refer to students is not part of Mr. Vlaming's official duties as defined by the Supreme Court in *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006).

222. Mr. Vlaming's expression, or lack thereof, regarding gender identity is protected by the Virginia Constitution.

223. Defendants' School Board Policies and their enforcement of those policies to fire Mr. Vlaming violated his right to free speech as guaranteed by the Virginia Constitution. Va. Const. art. I, § 12.

224. Defendants' actions caused injury to Mr. Vlaming including depriving him of his constitutional and statutory rights, loss of income, loss of future income, loss of future benefits including access to a pension, loss of reputation, and pain, suffering, and emotional distress.

## COUNT II

### Violation of Plaintiff's Right to Freedom of Speech Under the Virginia Constitution: Viewpoint and Content Discrimination
#### (Va. Const. art. I, § 12)

225.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–212 of this Complaint.

226.    By firing Mr. Vlaming for expressing his views regarding gender identity and for not expressing the Board's views regarding gender identity, Defendants have engaged in content and/or viewpoint discrimination in violation of the Virginia Constitution.

227.    Defendants' School Board Policies require the Board or its designees to evaluate the content and viewpoint of faculty expression to determine whether it constitutes discrimination or harassment under these policies.

228.    Defendants considered the content and viewpoint of Mr. Vlaming's expression when they decided to enforce their School Board Policies by suspending and then firing him.

229.    Defendants' School Board Policies confer unbridled discretion upon Defendants to discriminate based on content and viewpoint.

230.    Defendants exercised this unbridled discretion when they fired Mr. Vlaming for expressing his views regarding gender identity and refusing to express the Board's views regarding gender identity.

231.    Defendants' School Board Policies and their enforcement of those policies are unconstitutionally overbroad because they restrict a significant amount of constitutionally protected speech.

232.    Defendants' School Board Polices and their enforcement of those policies are unconstitutionally vague, ambiguous, and contradictory.

233. Defendants' School Board Policies and related practices are unconstitutionally vague because they prohibit both "sex" discrimination and "gender identity" discrimination which are inherently in conflict.

234. Defendants' School Board Polices and their enforcement of those policies are unconstitutionally vague and ambiguous because they do not define "nondiscrimination," "harassment," or "gender identity."

235. The discussion of how to respond to individuals with gender dysphoria and whether to alter use of pronouns, or not use pronouns, is a matter of public concern and public debate as defined by the Supreme Court in *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 138 S. Ct. 2448, 2473 (2018).

236. Compelling an individual to express an objective biological falsehood is not a lawful message.

237. The discussion of how to respond to individuals with gender dysphoria and whether to alter use of pronouns is not curricular speech.

238. Using, or not using, pronouns to refer to students is not curricular speech.

239. Using, or not using, pronouns to refer to students is not part of Mr. Vlaming's official duties as defined by the Supreme Court in *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006).

240. Mr. Vlaming's expression, or lack thereof, regarding gender identity is protected by the Virginia Constitution.

241. By firing him for allegedly violating their School Board Policies, Defendants have punished Mr. Vlaming for engaging in expression, or lack thereof, that the Virginia Constitution protects.

242.   Defendants' School Board Policies and their enforcement of those policies to fire Mr. Vlaming violated his right to free speech as guaranteed by the Virginia Constitution. Va. Const. art. I, § 12.

243.   Defendants' actions caused injury to Mr. Vlaming including depriving him of his constitutional and statutory rights, loss of income, loss of future income, loss of future benefits including access to a pension, loss of reputation, and pain, suffering, and emotional distress.

## COUNT III

**Violation of Plaintiff's Right to Freedom of Speech Under the Virginia Constitution:
Retaliation
(Va. Const. art. I, § 12)**

244.   Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–212 of this Complaint.

245.   By threatening discipline and firing him for expressing or not expressing his views regarding gender identity, Defendants retaliated against Mr. Vlaming for exercising his right to free speech protected by the Virginia Constitution.

246.   The Virginia Constitution protects Mr. Vlaming's right to communicate, or not communicate his views regarding gender identity, including through the use, or non-use, of pronouns.

247.   When Mr. Vlaming communicated his views regarding gender identity through his choice of pronouns in his interactions with students and other school staff, he was speaking on a matter of public concern and engaging in expression protected by the Virginia Constitution.

248.   The discussion of how to respond to individuals with gender dysphoria and whether to alter use of pronouns, or not use pronouns, is a matter of public concern and public debate as defined by the Supreme Court in *Janus v. American*

*Federation of State, County, and Municipal Employees, Council 31*, 138 S. Ct. 2448, 2473 (2018).

249.    Compelling an individual to express an objective biological falsehood is not a lawful message.

250.    The discussion of how to respond to individuals with gender dysphoria and whether to alter use of pronouns is not curricular speech.

251.    Using, or not using, pronouns to refer to students is not curricular speech.

252.    Using, or not using, pronouns to refer to students is not part of Mr. Vlaming's official duties as defined by the Supreme Court in *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006).

253.    Mr. Vlaming's interest, as a teacher of languages, in discussing matters of public concern in the context of interaction with his students and fellow staff outweighs Defendants' interests in compelling the use of pronouns other than those that refer to a students' biological sex or in the efficient provision of services.

254.    Mr. Vlaming's speech on matters of public concern in the context of his teaching never prevented Defendants from efficiently providing services to the public (or even threatened to do so).

255.    Defendants' School Board Policies and their enforcement of those policies to fire Mr. Vlaming would deter a person of ordinary firmness from continuing to engage in protected speech.

256.    Defendants' School Board Policies and their enforcement of those policies to fire Mr. Vlaming violated his right to free speech as guaranteed by the Virginia Constitution. Va. Const. art. I, § 12.

257.    Defendants' actions caused injury to Mr. Vlaming including depriving him of his constitutional and statutory rights, loss of income, loss of future income,

loss of future benefits including access to a pension, loss of reputation, and pain, suffering, and emotional distress.

## COUNT IV

**Violation of Plaintiff's Right to Free Exercise of Religion Under the Virginia Constitution and the Act for Religious Freedom**
**(Va. Const., art. I, § 16 and Va. Code §57–1)**

258.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–212 of this Complaint.

259.    By firing Mr. Vlaming for exercising his sincerely held religious beliefs in the way that he discusses issues regarding gender identity, including the use of pronouns consistent with a person's biological sex, Defendants violated his right to free exercise of religion under the Virginia Constitution and the Act for Religious Freedom.

260.    Mr. Vlaming's views and expression related to gender identity, including the use of pronouns, are motivated by his sincerely held religious beliefs and are avenues through which he exercises his religious faith.

261.    Expressing the School Board's mandated message regarding gender identity would require Mr. Vlaming to violate his sincerely held religious beliefs.

262.    Firing Mr. Vlaming for not using pronouns that violated his conscience compelled him to "suffer on account of his religious opinions or belief."

263.    Firing Mr. Vlaming for not using pronouns that violated his conscience restricted his "free[dom] to profess, and by argument to maintain, [his] opinions in matters of religion, and . . . diminish[ed] [his] . . . civil capacities."

264.    Defendants' interpretation of their School Board Policies creates a religious test for public school teachers.

265.    Defendants' School Board Policies and their enforcement of those policies to fire Mr. Vlaming violated Mr. Vlaming's right to free exercise of religion

as guaranteed by the Virginia Constitution and the Act for Religious Freedom. Va. Const., art. I, § 16 and Va. Code §57–1.

266. Defendants' actions caused injury to Mr. Vlaming including depriving him of his constitutional and statutory rights, loss of income, loss of future income, loss of future benefits including access to a pension, loss of reputation, and pain, suffering, and emotional distress.

**COUNT V**

**Violation of Plaintiff's Right to Exercise of Religion Under Virginia Code § 57–2.02**
**(Va. Code § 57–2.02)**

267. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–212 of this Complaint.

268. Mr. Vlaming's sincerely held religious beliefs prohibit him from using male pronouns to refer to a female and *vice versa*.

269. By compelling him to use male pronouns to refer to a female or be fired, Defendants imposed a substantial burden on Mr. Vlaming's religious exercise and coerced him into either changing or violating his sincerely held religious beliefs or being fired.

270. Compelling Mr. Vlaming to use male pronouns to refer to a female student furthers no compelling governmental interest and is not narrowly tailored to further any compelling governmental interest.

271. Firing Mr. Vlaming or compelling him to speak specific words was not the least restrictive means of furthering Defendants' stated interests.

272. Enforcing the School Board Policies to fire Mr. Vlaming violated Mr. Vlaming's civil rights under Virginia Code §57–2.02.

273. Defendants' actions caused injury to Mr. Vlaming including depriving him of his constitutional and statutory rights, loss of income, loss of future income,

loss of future benefits including access to a pension, loss of reputation, and pain, suffering, and emotional distress.

## COUNT VI

### Violation of Plaintiff's Right to Due Process under the Virginia Constitution (Va. Const., art. I, § 11)

274.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–212 of this Complaint.

275.    By disciplining and firing him under vague policies, Defendants violated Mr. Vlaming's right to due process of law under Section 11 of the Virginia Constitution's Bill of Rights (Article I).

276.    Mr. Vlaming's expression regarding gender identity is protected by the Virginia Constitution.

277.    By accusing him of discrimination and harassment and firing him for allegedly violating the School Board Policies, Defendants punished Mr. Vlaming for engaging or refusing to engage in expression that the Virginia Constitution protects.

278.    Defendants' School Board Policies and related practices are unconstitutionally vague because they grant school officials unbridled discretion in deciding what constitutes "gender identity" and gender identity "discrimination" or "harassment," because they utilize terms that are inherently subjective and elude any precise or objective definition that would be consistent from one administrator, teacher, or student to another, because they are incapable of providing meaningful guidance to Defendants and other school officials, and because they force teachers and students to guess whether expression that the Virginia Constitution protects is in fact allowed.

279.    Defendants' School Board Policies and related practices are unconstitutionally vague because they prohibit both "sex" discrimination and "gender identity" discrimination which are inherently in conflict.

280.    For example, by ordering Mr. Vlaming to treat his female student as if she were a male, Defendants have ordered Mr. Vlaming to treat her differently than other females.

281.    Defendants' School Board policies and related practices fail to provide a person of ordinary intelligence fair notice of what is prohibited, and is so standardless that it authorizes discriminatory enforcement.

282.    The lack of objective criteria, factors, or standards in Defendants' School Board Policies and related practices renders these policies and practices unconstitutionally vague and in violation of Mr. Vlaming's right to due process of law under the Virginia Constitution. Va. Const., art. I, § 11.

283.    Defendants' actions caused injury to Mr. Vlaming, including depriving him of his constitutional and statutory rights, loss of income, loss of future income, loss of future benefits including access to a pension, loss of reputation, and pain, suffering, and emotional distress.

## COUNT VII

**Violation of Plaintiff's Right to be Free from Governmental Discrimination under the Virginia Constitution (Va. Const., art. I, § 11)**

284.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–212 of this Complaint.

285.    By firing Mr. Vlaming for expressing his views (through not speaking certain pronouns) regarding gender identity when they do not punish teachers who express opposite views on those same subjects, Defendants have violated and are violating Mr. Vlaming's right to be free from governmental discrimination under the Virginia Constitution. Va. Const., art. I, § 11.

286.   Mr. Vlaming is similarly situated to other teachers at West Point High School.

287.   Defendants have taken no disciplinary action against teachers who support and endorse the School's viewpoint of gender identity, but they take disciplinary action against teachers, like Mr. Vlaming, who declined to endorse those viewpoints.

288.   Defendants' School Board Policies have also been applied to discriminate intentionally against Mr. Vlaming's rights to freedom of speech, freedom from compelled speech, free exercise of religion, and due process of law. Thus, discriminatory intent is presumed.

289.   Defendants' School Board Policies and related practices were applied to burden Mr. Vlaming's fundamental rights, target a protected class (religion), and have no rational basis.

290.   Defendants' School Board Policies and related practices are underinclusive, prohibiting some expression while leaving other expression equally harmful to the School's asserted interests unprohibited.

291.   Defendants applied their School Board Policies and related practices to Mr. Vlaming in a discriminatory and unequal manner, granting other teachers the right to express their views on issues related to gender identity while denying that right to Mr. Vlaming in violation of Vlaming's right to be from government discrimination under the Virginia Constitution. Va. Const., art. I, § 11.

292.   Defendants' actions caused injury to Mr. Vlaming including depriving him of his constitutional and statutory rights, loss of income, loss of future income, loss of future benefits including access to a pension, loss of reputation, and pain, suffering, and emotional distress.

## COUNT VIII

### Defendants' *Ultra Vires* Action and Violation of Plaintiff's Civil Rights in Violation of Virginia's Dillon Rule and Virginia Code §15.2–965 (Virginia Common Law and Va. Code §15.2–965)

293.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–212 of this Complaint.

294.    By enacting and enforcing the School Board Policies that prohibit harassment and discrimination on the basis of "gender identity," Defendants acted *ultra vires* and in violation of the Dillon Rule and Virginia Code §15.2–965.

295.    Defendants derive their authority from the Commonwealth of Virginia; these powers are limited to only those granted expressly or by necessary implication.

296.    The Dillon Rule and Virginia Code §15.2–965 prohibit Defendants from enacting non-discrimination policies that are more stringent than the laws of the Commonwealth.

297.    The laws of the Commonwealth delineate protected classes, but do not include "gender identity" as a specially protected classification.

298.    Defendants' actions in revising the School Board Policies to include "gender identity" and enforcing these policies to fire Mr. Vlaming violate the Dillon Rule and Virginia Code §15.2–965.

299.    Defendants' actions caused injury to Mr. Vlaming including depriving him of his constitutional and statutory rights, loss of income, loss of future income, loss of future benefits including access to a pension, loss of reputation, and pain, suffering, and emotional distress.

## COUNT IX

### Breach of Contract

300.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–212 of this Complaint.

301.    Mr. Vlaming and the School Board were parties to an enforceable employment contract.

302.    The School Board breached the contract by firing Mr. Vlaming, ceasing paying him, and denying him access to benefits.

303.    The School Board's actions were arbitrary, capricious, and without authority under law.

304.    Defendants' actions caused injury to Mr. Vlaming including loss of income, loss of future income, loss of future benefits including access to a pension, loss of reputation, and pain, suffering, and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Peter Vlaming respectfully requests that this Court enter judgment against Defendants and provide Plaintiff with the following relief:

A.    A declaratory judgment that Defendants' policies and actions violated:

1.    Mr. Vlaming's right to free speech under the Virginia Bill of Rights, Article I, § 12 of the Virginia Constitution;

2.    Mr. Vlaming's right to free exercise under the Virginia Bill of Rights, Article I, § 16 of the Virginia Constitution and Virginia Code § 57–1;

3.    Mr. Vlaming's right to free exercise under Virginia Code § 57–2.02;

4.    Mr. Vlaming's right to due process under the Virginia Bill of Rights, Article I, § 11 of the Virginia Constitution;

5.    Mr. Vlaming's right to be free from government discrimination under the Virginia Bill of Rights, Article I, § 11 of the Virginia Constitution;

6.    The Dillon Rule and Virginia Code § 15.2–965 and are void *ab initio*; and/or

7.    Mr. Vlaming's rights under his contact with the School Board.

B.     A permanent injunction requiring Defendants to reinstate Mr. Vlaming to the same position at an equal or higher salary, and treat him as if he had continuously been employed by West Point School District for all personnel-related decisions such as promotions, salary, and contract status.

C.     A permanent injunction prohibiting Defendants sued in their official capacities, their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing the School Board Policies to prohibit individuals from expressing views regarding gender identity or to punish them for expressing those views, including addressing and referring to students based on their biological sex.

D.     An injunction requiring Defendants to expunge any and all personnel or disciplinary records related to this matter.

E.     Damages in the amount of $500,000.00 for lost wages, future lost wages, lost benefits, and future lost benefits.

F.     Damages in the amount of $500,000.00 for loss of reputation, pain, suffering, and emotional distress.

G.     Nominal damages for the violation of Plaintiff's constitutional and statutory rights.

H.     Plaintiff's reasonable attorneys' fees and costs.

I.     Pre- and post-judgment interest if applicable.

J.     All other relief to which Plaintiff may be entitled.

Respectfully submitted,

_____
Of Counsel

Shawn A. Voyles, Esquire
Virginia State Bar #43277
MCKENRY DANCIGERS DAWSON, P.C.
192 Ballard Court, Suite 400
Virginia Beach, VA 23462
Tel:    (757) 461-2500
Fax:    (757) 461-2341
Email:  savoyles@va-law.org

J. Caleb Dalton, Esquire
Virginia State Bar #83790
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, D.C. 20001
Tel:    (202) 393-8690
Fax:    (202) 347-3622
Email:  cdalton@ADFlegal.org
*Co-Counsel for Plaintiff*

## Index of Exhibits to Complaint*

| Ex. | Description | Page |
|---|---|---|
| 1 | March 22, 2017 Continuing Contract Announcement | 1 |
| 2 | Transgender Student Rights: The Basics, NCTE | 3 |
| 3 | Fact Sheet, NCTE | 5 |
| 4 | October 31, 2018 Letter from Principal Jonathan Hochman to Peter Vlaming | 10 |
| 5 | November 5, 2018 Letter from Peter Vlaming to Superintendent Laura Abel | 12 |
| 6 | November 6, 2018 Letter from Principal Jonathan Hochman to Peter Vlaming | 16 |
| 7 | November 7, 2018 Directive from Superintendent Laura Abel to Peter Vlaming | 19 |
| 8 | November 8, 2018 Letter from Superintendent Laura Abel to Peter Vlaming | 22 |
| 9 | January 2, 2019 Letter from Chairman Paul Diggs to Peter Vlaming and Superintendent Laura Abel | 24 |
| 10 | West Point School Board Policy AC | 30 |
| 11 | West Point School Board Policy GBA/JFHA | 32 |
| 12 | May 22, 2018 Contract | 41 |

**\*Identifying information for minors has been redacted from all exhibits. Unredacted versions of exhibits are available for review under seal.**

# EXHIBIT 1



West Point Public Schools

March 22, 2017

Mr. Peter Vlaming
202 Richard Buck North
Williamsburg, VA  23185

Dear Mr. Vlaming:

I am delighted to inform you that, on Tuesday, March 21, 2017, I recommended to the West Point School Board that you be granted continuing contract status effective with the 2017-2018 school year.  The Board unanimously granted you a continuing contract effective August 2017.

We all look forward to working with you in the future.

Sincerely,

Laura K. Abel
Superintendent

/lac

c:    Mr. Dorsey
      Ms. Muse
      Personnel file

A Bridge to Opportunity

P.O. Box T, West Point, Virginia 23181    Phone: (804) 843-4368    Fax: (804) 843-4421

# EXHIBIT 2



Stay up to date with the latest on the law.

Please enter your email address          Subscribe

By submitting this form, you agree to Findlaw.com's terms. We respect your privacy

Many students face harassment and discrimination at school. Transgender
and gender non-conforming students are particularly vulnerable to
mistreatment from both fellow students and school officials. The following is an overview of some of the
laws and regulations that have been used to protect students facing harassment or discrimination on
account of their gender identity.

**Common Forms of Gender Discrimination**

Discrimination against transgender students may include being expelled from school, kicked out of class,
held after school, or otherwise treated differently as a result of their gender identity or expression. Other
areas that impact transgender students specifically include the use of names and pronouns with the intent
to harass or mock, restrictions or confrontations regarding restroom use, in the administration of gender
segregated classes and extracurricular activities, and in the application of dress codes

# EXHIBIT 3



# Fact Sheet on U.S. Department of Education Policy Letter on Transgender Students

## WHAT THE POLICY LETTER DOES

The policy letter explains how schools are required to treat transgender students under Title IX, the federal law prohibiting sex discrimination in education. It lays out the principles that the Department of Education will follow when it enforces Title IX, which should be given great weight by courts in interpreting the law.

Under this policy, schools are required to treat transgender students according to their gender identity, including by making sure that transgender students have access to restrooms and locker rooms that match their gender identity, using the right names and pronouns for transgender students, and letting them dress in accordance with their gender.

## SCHOOLS COVERED BY THE POLICY

The guidance applies to all K-12 schools, preschools, colleges and universities that get federal funding. A school receives federal funding if it gets any federal grants, contracts or loans, or if any of its students get financial aid from the federal government. That includes every public school across the country—including public charter schools—and most private colleges.

## RESTROOMS AND LOCKER ROOMS

The guidance makes clear that students have a right to use the restrooms and locker rooms that match their gender identity. Schools can't force a transgender student to use facilities that don't match their gender identity or segregate them into separate facilities, like a single-user restroom or an isolated area of locker room. Transgender and non-transgender students who want additional privacy in a restroom or locker room for any reason can ask their school an alternative. For example, a school can let a student who requests it use a single-user restroom or add curtains or stalls in locker rooms to give everyone more private options.

## NAMES, PRONOUNS, AND STUDENT RECORDS

Students have the right to be addressed by the names and pronouns that they use. That's true even if they haven't legally changed their name or gender. If teachers and school officials refuse to use the right name and pronouns, they may be breaking the law. Schools also must take reasonable steps to protect transgender students' privacy, including regarding their birth name. For example, the Department of Education points to state and local policies that allow students to list a chosen name other than their legal name in school records and use this name for most school purposes, while keeping a legal name the student does not use in a segregated, confidential file.



**DRESS CODES**

Schools can require students to follow a dress code. However, students have the right to dress in a way that matches their gender identity. So, for example, if a transgender girl wears a dress to school, and the school code permits other girls to wear dresses just like hers, the school can't claim that she's not following the dress code just because they believe she should be wearing boys' clothes. In addition, the Department of Education's letter is clear that a student's appearance should not have to "conform to stereotypical notions of masculinity or femininity."

It is also important to understand that a school also can't enforce the dress code more strictly against a transgender or gender nonconforming student than they do against other students. For example, if the school dress code officially doesn't allow students to wear bracelets, but girls wear bracelets to school all the time without getting in trouble, a school can't single out a transgender girl who comes to school wearing a bracelet and discipline her but not other girls.

**RESPECTING STUDENTS' GENDER IDENTITIES**

The Department of Education's policy recognizes that students should be treated according to their gender identity. Schools should not require transgender students to change the gender marker on IDs or show evidence of medical treatment in order to be treated respectfully.

**NON-BINARY OR GENDERQUEER STUDENTS**

Title IX protects not only transgender boys and girls, but also students whose genders aren't entirely male or female, sometimes called non-binary or genderqueer students. While the Department of Education guidance does not specifically state how it applies to these students, other federal, state, and local policies recognize that these student should determine which locker rooms and restrooms, pronouns, and dress code standards are most appropriate for them in accordance with their gender identity.

**CONFIDENTIALITY OF PERSONAL INFORMATION**

Students' right to privacy about their personal information is protected by federal law. Revealing a student's transgender status, birth name, sex assigned at birth, or medical history to classmates, parents, teachers and others may violate the federal educational privacy law, known as FERPA. While it's not always possible to prevent other people from finding out about a student's transgender status, schools must make every effort to keep that information private unless the student has given them permission to share it. Transgender students have a right to decide who finds out about their transgender status, unless there is a legitimate educational reason for sharing the information. This reason cannot simply be based on others' potential discomfort. Even if a student discloses information about their transgender status to some people or in some settings, this does not authorize the school to disclose it to others.



National Center for
TRANSGENDER
EQUALITY

While many transgender students have the support of their families, some do not have supportive families, and inadvertent disclosures could even put the student in danger. Parents have a right to request information in a student's official school records. Absent such a request, the Department of Education provides examples of state and local policies that call for staff to work together with transgender students on a case-by-case basis to determine how the school should communicate with parents, teachers and peers, and how much information the student is comfortable sharing with those people.

**STUDENT HEALTH PLANS**
The policy letter does not discuss insurance coverage offered by schools, colleges, or universities. However, Affordable Care Act prohibits discrimination based on transgender status in many student health plans. This section prohibits most insurance companies from discriminating against transgender students—including by having policies that exclude transition-related care from coverage.

**ANTI-TRANS STATE LAWS**
Title IX overrides state laws that conflict with it. That means that laws like North Carolina's HB 2, which tries to force trans students into restrooms that don't match their gender, are not enforceable. Schools that refuse to follow Title IX can face serious consequences from the federal government, even if they are relying on a contrary state law. HB 2 is currently being challenged in court, including in a lawsuit by the Department of Justice.

**ENFORCING TRANSGENDER STUDENTS' RIGHTS**
If schools don't follow the Title IX requirements in this policy, the Department of Education can enforce it in several ways. The Department's Office for Civil Rights, the office that is responsible for making sure that schools follow nondiscrimination requirements, investigates complaints made by students and parents. The Department of Education can also sue schools that discriminate against transgender students and seek to deny them federal funding.

If your school is not following the Department of Education's policy, make sure that your principal or school district staff are aware of it, and explain why it's important that they follow it. If your school still refuses to follow what the Department of Education says, or does something else that discriminates against a trans or gender non-conforming student, you can file a complaint with the Department of Education's Office of Civil Rights. To learn how you can file a complaint, check out NCTE's guide, Transgender and Gender Non-Conforming Students: Your Rights at School. You don't need a lawyer to file a complaint, but you might find it useful to reach out to an LGBT-friendly lawyer for help.

**Does the guidance make exceptions for any schools?**
Some religious schools can ask for an exemption under Title IX if there is something the law requires them to do something that conflicts with their religious beliefs. If they get an



exemption, it is only for the specific action that conflicts with their religious beliefs—not for other aspects of Title IX. Also, if a school gets an exemption under Title IX, that doesn't mean that they have an exemption under any other federal law that may protect transgender students, including laws protecting student privacy and prohibiting discrimination in health plans, employment, or housing.

Single-sex schools also get a limited exception. A small number of elementary and secondary schools and private undergraduate colleges may choose who to admit, and they are allowed but not required to admit students according to their gender identity. Once a person is admitted, though, single-sex schools are not allowed to discriminate against them, no matter what gender they identify with.

# EXHIBIT 4

**WEST POINT HIGH SCHOOL**

*A Bridge to Opportunity*

To: Peter Vlaming

Date: October 31, 2018

10/31/2018

The purpose of this letter is to inform you that I recommending to the Superintendent of West Point Public Schools, Ms. Laura Abel, that you be placed on administrative leave pending the outcome of an investigation into your actions surrounding ██████████  You are to report directly to Ms. Abel's office.

Jonathan Hochman

*"West Point Schools- A Bridge to Opportunity"*

**2700 Mattaponi Avenue    West Point, VA 23181   (804) 843-3630**

The Town of West Point School Board does not unlawfully discriminate on the basis of age, gender, race, color, religion, disability, or national origin in its employment practice or educational program and activities.

# EXHIBIT 5

Peter Vlaming
2902 Richard Buck North
Williamsburg, VA 23185
(757) 903-6080

November 5th, 2018

Mrs. Laura Abel
Superintendent
West Point Public Schools
1626 Main Street
West Point, VA 23181

Dear Mrs. Abel,

At your request, this letter addresses the events concerning which I have suspended. I am happy
to provide more detail at our meeting tomorrow.

On Thursday, October 18th, 2018 about four of my students were in my classroom during 8th
period to make up and retake various quizzes. ███████████ was among those students.
About mid-period ████ asked permission to go speak with another teacher. I agreed. Later in
the period, at about 3:15 p.m., I mentioned out loud that there was little time left to take the quiz
and that ████ had not yet returned. A student, ███████████, offered to go find ████. I
agreed. ████ returned later saying, "I found him. He is with [a certain teacher]." Given that I
was managing several things - lesson planning, grading, helping students review, and
administering quizzes - I had forgotten that ████ had gone out to look for ████. So, I asked
him who he was talking about. He responded saying something along the lines of "You sent me
out to look for him." I still didn't understand that ████ was talking about ████. Dexter
finally said in a low voice, "████." That's when I understood and I responded, "Oh right!
Thanks."

The following Sunday evening, ████ sent me an email asking when we could meet to discuss
something important. I responded suggesting the next day, Monday, October 22nd, at the
beginning of 8th period. ████ arrived at that time in my room and informed me that ████
████ had related my forgetfulness - explained in detail in the paragraph above - which was
interpreted, either by ████ or ████, or both, as willful ignorance. I was characterized as
playing a game where I was refusing to acknowledge that ████ was referring to ████ That is
not true. It is a false interpretation. When ████ was explaining ████'s whereabouts, I truly
had no idea who he was referring to.

After arriving at home that same afternoon I called Mrs. ███████ as a professional courtesy pursuant to my conversation with █████. I told Mrs. ███████ that I was very happy to have ███████ in class, and that I really appreciated █████'s combination of humor, wit, and intelligence. Mrs. ███████ mentioned that █████ thought our talk earlier that day went well. I advised Mrs. ███████ that I respected █████ and her family's choice and would continue to respect it, including my continuing to call █████ by the legal name █████ and making every effort to avoid feminine pronouns. Mrs. ███████ was upset about my views and advised me that I was to check my religious convictions at the door. The conversation ended with us agreeing to have a meeting with the principal. This was a lengthy conversation and I am happy to provide more detail in person.

I spoke with Mrs. Aunspach the following morning. Mr. Hochman was not available, but did call me that day on my cell phone. I also spoke with Mr. Hochman upon his return on Tuesday, October 30th. These were substantive conversations and I am happy to provide more detail in person.

During first period of Wednesday, October 31st, Mr. Hochman informed me in a meeting with Mrs. Aunspach that the ███████ now did not want to meet, and that I would be receiving a letter formally charging me with non-conformity to school board policy. This was a substantive conversation and I am happy to provide more detail in person.

During sixth period on Wednesday, October 31st, 2018, at approximately 10 a.m., I was overseeing an activity for my French II class. The students were working in pairs using the virtual reality goggles. We were in the hallway near my classroom (room 118). In this activity one student was to wear the goggles while the other guided them so as to not run into lockers, doors, walls, or each other.

At one point ███████████ was wearing the goggles, guided by classmate ██████████. I noticed that █████ was not paying attention and █████ was about to walk into a wall. I, therefore, called out, speaking very quickly, "Don't let her walk into a wall!" Realizing immediately afterward that I had inadvertently used the feminine pronoun, I put my hand to my mouth. I then continued to supervise the activity until the end of class.

At the bell, ██████████ waited for the other students to leave before speaking to me. ████ said, "Mr. Vlaming, you may have your religion, but you need to respect who I am!" I then apologized.

I then walked to Mr. Hochman's office between classes to quickly let him know what had happened. Mr. Hochman responded, "You know what you do to diffuse a situation like that? You say, 'I'm sorry, I meant to say *him*.'" There was a pause of a couple of seconds after which I exited his office to return to my 7th period class that was about to start. In essence, I stuck my head in his office to let him know what had happened, I listened to his advice, and went back to class.

Upon returning from lunch break that same day I was summoned to the office where Mr. Hochman accused me of leaving in the middle of a meeting. I said, "That's not true," that I did not leave in the middle of a meeting. Mr. Hochman handed me a document recommending my immediate administrative leave. I then gathered my things in my classroom and reported to the school board office.

Sincerely,


Peter Vlaming

# EXHIBIT 6

# WEST POINT HIGH SCHOOL

*A Bridge to Opportunity*

To: Peter Vlaming

Date: November 5, 2018

The purpose of this final warning letter is to document your inappropriate and unacceptable actions as they relate to ███████████, a transgender student who attends West Point High School. The █████████ family has requested that ████████ be referred to as a male student and that male pronouns be used when referencing ████████. You and I met regarding this situation on October 30th and 31st of 2018. In those meetings, I explained our expectations and the expectations of █████ and his parents. I provided you with a verbal directive to use male pronouns when referring to █████. You informed me that you would not use male pronouns and would only refer to █████ by his name. Your repeated refusal to follow directives is insubordination and will not be tolerated. Your continued failure to use male pronouns when referring to █████ is in direct conflict with the following West Point Public Schools policies:

## GBA/JFHA, PROHIBITION AGAINST HARASSMENT AND RETALIATION

"In accordance with law, the Board prohibits harassment against students on the basis of sex, gender, race, color, national origin, disability, religion, ancestry, age, marital status, genetic information or any other characteristic protected by law or based on a belief that such characteristic exists at school or any school sponsored activity. It is a violation of this policy for any student or school personnel to harass a student based on race, color, religion, national origin, ancestry, political affiliation, sex, sexual orientation, gender, gender identity, age, marital status, genetic information or disability as defined by law, or based on a belief that such characteristic exists at school or any school sponsored activity."

## GBCB, STAFF CONDUCT AND RESPONSIBILITIES

"IAll staff members have a responsibility to be aware of and abide by all laws, School Board policies and administrative regulations which affect their work in the West Point school division. The School Board expects its staff members to conduct themselves in a professional and ethical manner. The School Board shall define "professional and ethical manner" as required by facts and circumstances."

After we met to discuss █████ for the second time, on October 31, an incident occurred in your classroom involving █████. █████ was wearing virtual goggles as a part of a class activity. █████ nearly walked into a wall and you yelled out "stop her!" █████ was upset by your continued refusal to use his preferred pronoun when referring to him in front of the class. █████ attempted to speak with you privately and asked you to please respect him. When you reported this incident to me on the afternoon of October 31, I suggested you should have apologized to █████ and used a male pronoun in doing so. You did not acknowledge my suggestion and instead, simply walked away. Failure to acknowledge my suggestion indicated to me your intent to not follow through on my directive to refer to █████ using male pronouns, thereby constituting insubordination.

*"West Point Schools- A Bridge to Opportunity"*
**2700 Mattaponi Avenue    West Point, VA 23181  (804) 843-3630**

Peter Vlaming
November  5,   2018
Page 2

From this point forward, you are expected to refer to ▇▇▇▇ using the appropriate male pronouns. The use of male pronouns should be consistent with how you address other male students. Failure to comply with this directive will result in further disciplinary action up to and including termination of employment,

Please contact me should you have any questions regarding this matter.

Sincerely,

Jonathan Hochman

cc: Laura Abel
      Personnel File

# EXHIBIT 7

# West Point Public Schools

November 7, 2018

Mr. Peter Vlaming
2902 Richard Buck North
Williamsburg, VA 23185

Dear Mr. Vlaming:

The purpose of this letter is to provide you with a written directive regarding my expectations for your interactions with ██████████ moving forward. As you know, you were suspended with pay on October 31, 2018, for your inappropriate treatment of ████ and your insubordination for refusing to comply with your administrator's directives regarding ████. As set forth in Mr. Hochman's letter to you dated November 5, 2018, you have repeatedly refused to refer to ████ with male pronouns despite being given specific directives to do so.

When you met with Ms. Custalow and me on November 6, 2018, you again indicated that you have purposely avoided the use of male pronouns to refer to ████ and that you just refer to him as ████. Refusing to treat ████ the same way you treat other male students is impermissible and will not be tolerated.

We also discussed the telephone call that you made to ████ mother on October 22, 2018. You claimed that you called Mrs. ██████ because parents should be advised when you talk to students about "serious" things and you also stated that the situation with ████ was "delicate." Despite recognizing that the situation was "serious" and "delicate," however, you did not speak with any administrator about the situation with ████.

Your telephone call to Mrs. ██████ was an inappropriate attempt to circumvent the directive that had been given to all of ████ teachers regarding how ████ was to be treated. Furthermore, it was an improper attempt to "negotiate" with Mrs. ██████ about how you would treat ████. The treatment of transgender students is not up for negotiation with their parents, with school administrators, or with me.

A Bridge to Opportunity

P.O. Box T, West Point, Virginia 23181    Phone: (804) 843-4368    Fax: (804) 843-4421

My expectation is that you will treat ███ the same as other male students, including using his preferred name and using male pronouns to refer to him. If you refuse to comply with this directive or if you have any further instances of using female pronouns or of avoiding the use of male pronouns to refer to ███ it will be considered insubordination and will result in termination of your employment.

In addition, before you will be permitted to return to the classroom, you must meet with ███ and his parents, along with Mr. Hochman, to assure them that you will treat ███ the same as other male students, including using male pronouns to refer to him. If you refuse to comply with this directive, it will also be considered insubordination and will constitute additional grounds for the termination of your employment.

Please contact me immediately if you have any questions regarding this letter.

Sincerely,

Laura K. Abel
Superintendent

/lac

cc:    Personnel File

**A Bridge to Opportunity**

P.O. Box T, West Point, Virginia 23181    Phone: (804) 843-4368    Fax: (804) 843-4421

# EXHIBIT 8



# West Point Public Schools

November 8, 2018

Mr. Peter Vlaming
2902 Richard Buck North
Williamsburg, VA 23185

Dear Mr. Vlaming:

This is to advise you that you are suspended with pay effective immediately, pending the outcome of your recommended dismissal. The reason for your suspension is your continued insubordination with regard to your treatment of a student. As you know, you were given written and verbal directives that you were to use male pronouns when referring to the student and you repeatedly refused to do so. When you and I met yesterday, I gave you another written directive and you again refused to comply.

You have a right to a hearing before the School Board on your suspension. Should you desire such a hearing, you must file a written request for a hearing with the Division Superintendent within ten business days of the receipt of this letter or you will be deemed to have waived your right to a hearing on your suspension.

Sincerely,

Laura Abel
Superintendent

A Bridge to Opportunity

P.O. Box T, West Point, Virginia 23181    Phone: (804) 843-4366    Fax: (804) 843-4421

# EXHIBIT 9

# West Point Public Schools

January 2, 2019

Mr. Peter Vlaming
2902 Richard Buck North
Williamsburg, VA 23185

Mrs. Laura Abel
P.O. Box T
West Point, VA 23181

Dear Mr. Vlaming and Mrs. Abel:

This letter sets forth the West Point School Board's rationale for voting to accept the recommendation of the Division Superintendent, Mrs. Abel, that Mr. Vlaming be dismissed from his employment as a teacher with West Point Public Schools. On November 9, 2018, Mrs. Abel provided written notice to Mr. Vlaming that he was being recommended for dismissal. Pursuant to Part III of the Procedure for Adjusting Grievances, 8 VAC 20-90-10 et seq., Mr. Vlaming requested a public hearing, which was held on December 6, 2018. Mr. Vlaming and Mrs. Abel were represented by counsel.

Neither Mr. Vlaming nor his attorney made a request for the reasons for the Superintendent's recommendation, as permitted by the grievance procedure. However, at the beginning of the hearing, the Superintendent, by counsel, stated the following reasons for her recommendation: (1) Mr. Vlaming repeatedly refused to comply with the nondiscrimination and nonharassment policies adopted by this School Board and (2) Mr. Vlaming repeatedly refused to comply with directives from his Acting Principal, his Principal, and the Superintendent that he comply with the nondiscrimination and nonharassment policies adopted by the School Board.

After consideration of the evidence and information presented during the December 6, 2018 hearing, the West Point School Board voted to uphold the Superintendent's recommendation that Mr. Vlaming's employment with West Point Public Schools be terminated. The School Board's rationale and decision regarding that action are set forth below.

## FINDINGS OF FACT

The School Board makes the following findings of fact:

1. The School Board has adopted policies prohibiting discrimination against and harassment of students, staff, and others on the basis of gender identity.

2. Specifically, Policy AC states, "The West Point School Board is committed to nondiscrimination with regard to … gender identity." Policy AC also states, "This commitment will prevail in all division policies and practices concerning staff, students, educational programs and services."

3. Policy GBA/JFHA states, "The West Point School Board is committed to maintaining an educational environment and workplace that is free from harassment. In accordance with the law, the Board prohibits harassment against students, employees, and others on the basis of …gender identity." Policy GBA/JFHA also states, "It is a violation of this policy for any student or school personnel to harass a student … based on … gender identity."

4. Policy GBCB states, "All staff members have a responsibility to be aware of and abide by all laws, School Board policies and administrative regulations which affect their work in the West Point school division. The School Board expects its staff members to conduct themselves in a professional and ethical manner."

5. The parent of a transgender student who had recently undergone a gender transition and legal name change, along with the student, met with the Acting Principal of West Point High School on August 23, 2018.

6. The parent and student, who is in ninth grade, requested that the school staff use the student's new name and use male pronouns to refer to the student.

7. Mr. Vlaming, who had taught the student the prior year and was scheduled to teach the student again in the current year, also met with the parent and student on or about August 28, 2018, to discuss the use of the student's new name and male pronouns. The Guidance Counselor also attended this meeting. Following the meeting, Mr. Vlaming told the Guidance Counselor that he would not use male pronouns to refer to the student. The Guidance Counselor explained to Mr. Vlaming that the student and his classmates would notice the lack of pronouns and the student may feel isolated by such treatment.

8. After Mr. Vlaming met with the parent and student, the Acting Principal told Mr. Vlaming that he was expected to use the student's preferred name and male pronouns to refer to the student. Mr. Vlaming did not explain that he had any objection or that he planned to disobey the directive.

9. Unbeknownst to the school administration, from September through mid-October 2018, Mr. Vlaming disobeyed the directive of the Acting Principal and, instead, attempted to avoid the use of any pronouns when addressing the student directly. Mr. Vlaming never used male pronouns to refer to the student and, by his own admission, he "slipped up" and used female pronouns in front of the student on multiple occasions. Additionally, Mr. Vlaming used female pronouns to refer to the student when speaking with colleagues and even other students.

10. The student heard from his classmates that Vlaming continued to use female pronouns to refer to him. Mr. Vlaming also continued to refer to other students by their preferred gender pronouns.

11. The student requested a meeting with Mr. Vlaming to discuss the student's concerns about Mr. Vlaming's refusal to use male pronouns.

12. The student met with Mr. Vlaming after class on October 22, 2018 to express his concerns to Mr. Vlaming.

13. Mr. Vlaming did not alert the school administration about the meeting or the student's concerns. Nor did he ever notify the school's administration that he had any objection to using male pronouns to refer to the student.

14. Mr. Vlaming did, however, contact the student's parent again on October 22, 2018.

15. According to the parent, during the October 22, 2018 phone call, Mr. Vlaming indicated that he was upset that other students had reported to the student that they had heard Mr. Vlaming using female pronouns to refer to the student. Mr. Vlaming indicated that he needed to censor himself when speaking with other students if they were going to tell the student what he was saying.

16. Also during the October 22, 2018 phone call, Mr. Vlaming told the parent that he would use the student's new name and male French name (selected by the student for use in French class) and the preferred nickname but that he would not use male pronouns to refer to the student.

17. Mr. Vlaming did not notify the school administration until October 23, 2018, the day after the phone call with the parent, that there was any issue with regard to the student.

18. On October 24, 2018 the Assistant Principal explained to Mr. Vlaming that he was required to use male pronouns to refer to the student. Mr. Vlaming indicated that he would not comply with the directive.

19. On October 24, 2018, Mr. Vlaming also spoke to the Principal via telephone. The Principal also directed Mr. Vlaming to use pronouns to refer to the student. Mr. Vlaming indicated that he would not comply with the directive.

20. On October 30, 2018, the Principal met with Mr. Vlaming and again explained to him that he must use male pronouns to refer to the student and that it was required by policy. The Principal also told Vlaming that there would be consequences if he continued to refuse to comply.

21. During the October 30, 2018 meeting, Mr. Vlaming indicated that he wanted to meet with the student's parents. When asked by the Principal how he intended to convince the student's parents to go along with his plan to not use any pronouns to refer to the student, Mr. Vlaming told the Principal that he was "going to dance around it."

22. The Principal and Assistant Principal met with Mr. Vlaming again on October 31, 2018. They informed Mr. Vlaming that the students' parents did not want to meet with him again. They reiterated the directive that he was to use male pronouns to refer to the student. Mr. Vlaming indicated that he would not comply with the directive.

23. Later that day, Mr. Vlaming returned to the Principal's office to report that he had a "slip up" in which he yelled "stop her" when the student, who was wearing Virtual Reality goggles as part of a class exercise, was about to walk into a wall. Mr. Vlaming did not correct himself or apologize, even after the Principal told him that an apology was the appropriate way to address the incident.

24. The Principal subsequently received an email from the student's parent requesting that the student be removed from Mr. Vlaming's class, citing the incident that occurred that day as well as noting that the parent had explained to Mr. Vlaming on several occasions that using incorrect pronouns and misgendering the student can have detrimental effects.

25. Mr. Vlaming was suspended by Mrs. Abel following the October 31, 2018 incident for the purpose of conducting an investigation to determine if Mr. Vlaming was knowingly and intentionally violating School Board policy and the directives of the school administration.

26. Mrs. Abel met with Mr. Vlaming on November 6, 2018 to determine whether the October 31 incident was a single "slip up" or whether Mr. Vlaming was knowingly and intentionally violating School Board policy and the directives of the school administration.

27. During the November 6, 2018 meeting, Mr. Vlaming confirmed to Mrs. Abel that he would not use male pronouns to refer to the student. He also confirmed that he received the directive from school administrators but that he never told them that he refused to comply. He also confirmed that he contacted the parent about his refusal but not school administration.

28. Mrs. Abel met with Mr. Vlaming again on November 7, 2018. She presented him with a letter explaining the inappropriateness of his actions with regard to the student and specific directives that must be followed in order for Mr. Vlaming to return to work. The directives were (1) that Mr. Vlaming would treat the student the same as other males, including using male pronouns and (2) that Mr. Vlaming would meet with the student and parents to assure them that he would treat the student the same as other male students, including the use of male pronouns.

29. The letter also stated that refusal to comply would constitute insubordination and grounds for termination of employment.

30. Mr. Vlaming was given an opportunity to privately review the letter, contact his attorney or other advisor, and consider the matter.

31. Mr. Vlaming told Mrs. Abel that he would not comply with her directive and he would not use male pronouns to refer to the student.

32. On November 9, 2018, Mrs. Abel provided written notice to Mr. Vlaming that he was being recommended for dismissal.

33. During the December 6, 2018 hearing before the School Board, Mr. Vlaming again confirmed that if he were permitted to return to teaching, he still would not use male pronouns to refer to the student.

## CONCLUSIONS

The School Board finds that both of the reasons stated by the Superintendent for Mr. Vlaming's recommended dismissal are substantiated by the evidence. Each of the stated reasons are addressed below.

The first reason articulated by the Superintendent was that Mr. Vlaming repeatedly refused to comply with the nondiscrimination and nonharassment policies adopted by this School Board. School Board Policy AC prohibits discrimination on the basis of gender identity. School Board Policy GBA/JFHA prohibits harassment on the basis of gender identity. Both are facially neutral policies of general applicability which all teachers and other staff members are expected to uphold. Moreover, these policies serve the important purpose of ensuring an educational environment that is safe, supportive, and inclusive.

It is undisputed that Mr. Vlaming treated the student differently from all other students by avoiding the use of pronouns when referring to the student in class, while using pronouns to refer to the other students. Mr. Vlaming's action had the effect of singling out the student in a way that was noticed by the student and his peers. Additionally, by continuing to use female pronouns to refer to the student – both in the student's presence and in the presence of other students, who reported that behavior to the student – Mr. Vlaming created an intimidating, hostile, and offensive educational environment for the student. The School Board concludes that Mr. Vlaming's actions violate both Policy AC and Policy GBA/JFHA.

The School Board further finds unavailing Mr. Vlaming's argument that Policy GBA/JFHA does not sufficiently define prohibited conduct. The Policy plainly states that "the [School] Board prohibits harassment against students … on the basis of … gender identity." The Policy goes on to explain that harassment consists of conduct relating to an individual's race, national origin,

disability, religion or other protected category . . ." Gender identity is one of the "other protected categories" specifically listed in the policy. Moreover, even if Mr. Vlaming did not initially understand how the policy applied to his treatment of this particular student, it was explained to him no fewer than six times by the Acting Principal, the Principal, and the Superintendent. Mr. Vlaming, however, deliberately chose not to follow Policy GBA/JFHA on multiple occasions. Moreover, as he made clear in his testimony at the December 6, 2018 hearing, Mr. Vlaming still would not comply with the policy if the School Board were to permit him to return to the classroom.

Accordingly, the School Board finds that the first reason articulated by the Superintendent was established by a preponderance of the evidence. The School Board also finds that this reason, standing alone, constitutes just cause to terminate Mr. Vlaming's employment.

The second reason articulated by the Superintendent was that Mr. Vlaming repeatedly refused to comply with directives from his Acting Principal, his Principal, and the Superintendent that he comply with the nondiscrimination and nonharassment policies adopted by the School Board. As noted above, Mr. Vlaming was given at least six explicit directives regarding how he was expected to treat the student. Mr. Vlaming repeatedly refused to comply with those directives and continued through the date of the hearing to insist that he would not comply. Therefore, the School Board concludes that Mr. Vlaming's actions constitute repeated instances of insubordination. The School Board also finds that this reason, standing alone, constitutes just cause to terminate Mr. Vlaming's employment.

For these reasons, the School Board voted to accept the Superintendent's recommendation that Mr. Vlaming be dismissed from employment, which is effective as of December 6, 2018, the date of the School Board's hearing and vote to uphold the recommendation of the Superintendent.

Sincerely,

Paul E. Diggs
West Point School Board Chairman

A Bridge to Opportunity

# EXHIBIT 10

File:  AC

## NONDISCRIMINATION

The West Point School Board is committed to nondiscrimination with regard to race, color, religion, national origin, ancestry, political affiliation, sex, sexual orientation, gender, gender identity, age, marital status, genetic information or disability as defined by law.  This commitment will prevail in all division policies and practices concerning staff, students, educational programs and services, and with individuals/entities whom the Board does business.

The Superintendent will develop regulations to ensure non-discriminatory practices and procedures and a process for reporting and investigating any violations should they occur.

Adopted:     July 22, 1992

Revised:     January 19, 1994; September 17, 1996; April 18, 2000; April 27, 2004; July 16, 2013; October 17, 2017

---

Legal Refs.:    20 U.S.C. §§ 1681- 1688.
           29 U.S.C. § 794.
           42 U.S.C §§ 2000d-2000d-7, 2000e – 2000e -17, 2000ff-1.

           34 C.F.R. 106.9.

           Constitution of Virginia, article I, section 11.

           Code of Virginia, 1950, as amended, §§ 2.2-3900, 2.2-3901, 2.2-3902.

Cross Refs.:    GB/JB        Equal Employment Opportunity/Nondiscrimination
           GBA/JFHA   Prohibition Against Harassment and Retaliation

# EXHIBIT 11

File: GBA/JFHA

## PROHIBITION AGAINST HARASSMENT AND RETALIATION

Policy Statement

The West Point School Board is committed to maintaining an educational environment and workplace that is free from harassment. In accordance with law, the Board prohibits harassment against students, employees, or others on the basis of sex, gender, race, color, national origin, disability, religion, ancestry, age, marital status, genetic information or any other characteristic protected by law or based on a belief that such characteristic exists at school or any school sponsored activity. The West Point School Board is an equal opportunity employer.

It is a violation of this policy for any student or school personnel to harass a student or school personnel based on race, color, religion, national origin, ancestry, political affiliation, sex, sexual orientation, gender, gender identity, age, marital status, genetic information or disability as defined by law, or based on a belief that such characteristic exists at school or any school sponsored activity. Further, it is a violation of this policy for any school personnel to tolerate harassment based on a student's or employee's race, color, religion, national origin, ancestry, political affiliation, sex, sexual orientation, gender, gender identity, age, marital status, genetic information or disability as defined by law or based on a belief that such characteristic exists at school or any school sponsored activity, by students, school personnel or third parties participating in, observing or otherwise engaged in school sponsored activities.

For the purpose of this policy, school personnel includes School Board members, school employees, agents, volunteers, contractors or other persons subject to the supervision and control of the school division.

The school division shall promptly:
- investigate all complaints, written or verbal, of harassment based on race, color, religion, national origin, ancestry, political affiliation, sex, sexual orientation, gender, gender identity, age, marital status, genetic information or disability as defined by law or based on a belief that such characteristic exists at school or any school sponsored activity;
- take appropriate action to stop any harassment;
- take appropriate action against any student or school personnel who violates this policy; and
- take any other action reasonably calculated to end and prevent further harassment of school personnel or students.

Definitions

Harassment Based on Sex

Harassment based on sex consists of unwelcome sexual advances, requests for sexual favors, sexually motivated physical conduct or other verbal or physical conduct and/or communication, which may include use of cell phones or the internet, of a sexual nature when:

- submission to that conduct or communication is made a term or condition, either explicitly or implicitly, of obtaining or retaining employment or education; or
- submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting that individual's employment or education; or
- that conduct or communication has the purpose or effect of substantially or unreasonably interferes with an individual's employment or education, or creates an intimidating, hostile or offensive employment or educational environment (i.e. the conduct is sufficiently severe, persistent or pervasive to limit a student's or employee's ability to participate in or benefit from the educational program or work environment).

Examples of conduct which may constitute harassment based on sex include:

- unwelcome, sexually motivated or inappropriate patting, pinching or other physical contact (other than necessary restraint of students by school personnel to avoid physical harm to people or property)
- unwelcome sexual flirtation or propositions
- sexual slurs, leering, epithets, threats, verbal abuse, derogatory comments or sexually degrading descriptions
- graphic verbal comments about an individual's body, or overly personal conversation of a sexual nature
- sexual jokes, notes, stories, drawings, gestures or pictures.
- spreading sexual rumors
- touching an individual's body or clothes in a sexual way
- displaying sexually suggestive objects, pictures, cartoons or posters
- impeding or blocking movement in a sexually intimidating manner
- sexual violence
- display of written materials, pictures, or electronic images
- unwelcome acts of verbal, nonverbal, written, graphic, or physical conduct based on sex or sex stereotyping

Harassment Based on Race, National Origin, Disability or Religion

Harassment based on race, national origin, disability or religion consists of physical or verbal conduct, which may include use of cell phones or the internet, relating to an individual's race, national origin, disability, religion or other protected category when the conduct:

- creates an intimidating, hostile or offensive working or educational environment;
- substantially or unreasonably interferes with an individual's work or education; or

- otherwise is sufficiently serious to limit an individual's employment opportunities or to limit a student's ability to participate in or benefit from the education program.

Examples of conduct which may constitute harassment based on race, national origin, disability, religion, or other protected category include:
- graffiti containing racially offensive language.
- name calling, jokes or rumors.
- physical acts of aggression against a person or his property because of that person's race, national origin, disability, religion or other protected category.
- slurs, negative stereotypes and hostile acts which are based on another's race, national origin, religion, disability, or other protected category.
- written or graphic material containing ethnic comments or stereotypes which is posted or circulated and is intended to degrade individuals based on their race, national origin, disability, religion, or other protected category.

Additional Prohibited Behavior

Behavior that is not unlawful may nevertheless be unacceptable for the educational environment or the workplace. Demeaning or otherwise harmful actions are prohibited, particularly if directed at personal characteristics including, but not limited to, socioeconomic level, sexual orientation, or perceived sexual orientation or gender identity.

Abusive Work Environments

The West Point School Board prohibits abusive work environments in the school division.

Any division employee who contributes to an abusive work environment shall be subject to appropriate discipline as determined by the Superintendent.

Retaliation or reprisal against School Board employees who make allegations of abusive work environments or assist in the investigation of allegations of abusive work environments is prohibited.

Complaint Procedure

Formal Procedure

File Report

Any student or school personnel who believes he or she has been the victim of harassment prohibited by law or by this policy by a student, school personnel or a third party should report the alleged harassment to one of the Compliance Officers designated in this policy or to any school personnel. If the harassment involves the building principal, reports are to be made directly to the division's Compliance Officer. Any complaint that involves the Compliance Officer shall be reported to the Superintendent. Any student or school personnel who believes he or she has been the victim of harassment prohibited by law or by this policy should report the alleged harassment

to the division's Compliance Officer.  The alleged harassment should be reported as soon as possible, and the report generally should be made within 15 (fifteen) school days of the occurrence. Any school personnel who has notice that a student or other school personnel may have been a victim of prohibited harassment shall immediately report the alleged harassment to the building principal or the division Compliance Officer designated in this policy.  Student procedures are outlined in policy JFHA.

The reporting party should use the form, Report of Harassment, GBA-F/JFHA-F, to make complaints of harassment.  However, oral reports and other written reports are also accepted.

The complaint, and identity of the complainant and alleged harasser shall not be disclosed except as required by law or policy, as necessary to fully investigate the complaint or as authorized by the complainant.  Additionally, a complainant who wishes to remain anonymous shall be advised that such confidentiality may limit the school division's ability to fully respond to the complaint.

Investigation

Upon receipt of a report of alleged prohibited harassment, the Compliance Officer shall immediately authorize or undertake an investigation.  The investigation may be conducted by school personnel or a third party designated by the school division. The investigation shall be completed as soon as practicable, which generally should be not later than 14 (fourteen) school days after receipt of the report by the Compliance Officer. Upon receiving the complaint, the Compliance Officer shall acknowledge receipt of the complaint by giving written notice that the complaint has been received to both the person complaining of harassment and the person accused of harassment.  Also upon receiving the complaint, the Compliance Officer shall determine whether interim measures should be taken pending the outcome of the investigation.  Such interim measures may include, but are not limited to, separating the alleged harasser and the complainant and, in cases involving potential criminal conduct, determining whether law enforcement officials should be notified. If the Compliance Officer determines that more than 14 (fourteen) school days will be required to investigate the complaint, the complainant and the accused shall be notified of the reason for the extended investigation and of the date by which the investigation will be concluded.  If the alleged harassment may also constitute child abuse, then it must be reported to the Department of Social Service in accordance with Policy JHG, Child Abuse and Neglect Reporting.

The investigation may consist of personal interviews with the complainant, the alleged harasser, and any others who may have knowledge of the alleged harassment or the circumstances giving rise to the complaint. The investigation will consider witnesses and evidence from both the alleged harasser and the person allegedly harassed. The investigation may also consist of the inspection of any other documents or information deemed relevant by the investigator. The school division shall take necessary steps to protect the complainant and others pending the completion of the investigation.

In determining whether alleged conduct constitutes a violation of this policy, the division shall consider, at a minimum:
- the surrounding circumstances;
- the nature of the behavior;
- past incidents or past or continuing patterns of behavior;
- the relationship between the parties;
- how often the conduct occurred;
- the identity of the alleged perpetrator in relation to the alleged victim (i.e. whether the alleged perpetrator was in a position of power over the alleged victim);
- the location of the alleged harassment;
- the ages of the parties and
- the context in which the alleged incidents occurred. Whether a particular action or incident constitutes a violation of this policy requires a case by case determination based on all of the facts and circumstances revealed after a complete and thorough investigation.

The Compliance Officer shall issue a written report to the Superintendent upon completion of the investigation. If the complaint involves the Superintendent, then the report shall be sent to the School Board. The report shall include a determination of whether the allegations are substantiated, whether this policy was violated and recommendations for corrective action, if any.

All employees shall cooperate with any investigation of alleged harassment conducted under this policy or by an appropriate state or federal agency.

Action by Superintendent

Within 5 (five) school days of receiving the Compliance Officer's report, the Superintendent shall issue a decision regarding (1) whether this policy was violated and (2) what action if any should be taken. This decision must be provided in writing to the complainant and the alleged perpetrator. If the Superintendent or Superintendent's designee determines that it is more likely than not that prohibited harassment occurred, the West Point School Division shall take prompt, appropriate action to address and remedy the violation as well as prevent any recurrence. Such action may include discipline up to and including expulsion or discharge. Whether or not the Superintendent or Superintendent's designee may determine that school-wide harassment occurred, the Superintendent or Superintendent's designee may determine that school-wide or division-wide training be conducted or that the complainant receives counseling.

Appeal

If the Superintendent or Superintendent's designee determines that no prohibited harassment occurred, the employee or student who was allegedly subjected to harassment may appeal this finding to the School Board within 5 (five) school days of receiving the decision. Notice of appeal must be filed with the Superintendent who shall forward the record to the School Board. The School Board shall make a decision within 30 (thirty) calendar days of receiving the record. The School Board may ask for oral or written argument from the aggrieved party, the Superintendent and any other individual the School Board deems relevant. Written notice of the School Board's decision will be given to both the alleged harasser and the person allegedly harassed.

File: GBA/JFHA
Page 6

If the Superintendent or Superintendent's designee determines that prohibited harassment occurred and discipline is imposed, the disciplined person may appeal the disciplinary sanction in the same manner as any other such sanction would be appealed.

Employees may choose to pursue their complaints under this policy through the relevant employee grievance procedure instead of the complaint procedure in this policy.

Compliance Officer and Alternate Compliance Officer

The West Point Public Schools School Board has designated the Director of Special Education and Student Services, P.O. Box T, West Point, VA 23181, (804) 843-4368, as the Compliance Officer responsible for identifying, preventing and remedying prohibited harassment. Complaints of harassment may also be made to the Human Resources Manager who serves as the division's Alternate Compliance Officer, (804) 843-4368.

The Compliance Officer or Alternate Compliance Officer shall:
- receive reports or complaints of harassment;
- conduct or oversee the investigation of any alleged harassment;
- assess the training needs of the school division in connection with this policy;
- arrange necessary training to achieve compliance with this policy; and
- ensure that any harassment investigation is conducted by an impartial investigator who is trained in the requirements of equal employment/education opportunity, and has the authority to protect the alleged victim and others during the investigation.

Informal Procedure

If the complainant and the person accused of harassment agree, the student's principal or principal's designee may arrange for them to resolve the complaint informally with the help of a counselor, teacher, or administrator.

If the complainant and the person accused of harassment agree to resolve the complaint informally, they shall each be informed that they have the right to abandon the informal procedure at any time and may pursue the Formal procedure, if so desired. The principal or principal's designee shall notify the complainant and the person accused of harassment in writing when the complaint has been resolved. The written notice shall state whether prohibited harassment occurred.

Retaliation

Retaliation against students or school personnel who report harassment or participate in any related proceedings is prohibited. The school division shall take appropriate action against students or school personnel who retaliate against any student or school personnel who reports alleged harassment or participates in related proceedings up to and including expulsion or termination of employment. The Compliance Officer will inform persons who make complaints, who are the subject of complaints, and who participate in investigations, of how to report any subsequent problems.

File: GBA/JFHA
Page 7

Right to Alternative Complaint Procedure

Nothing in this policy shall deny the right of any individual to pursue other avenues of recourse to address concerns relating to prohibited harassment including initiating civil action, filing a complaint with outside agencies or seeking redress under state or federal law.

Prevention and Notice of Policy

Training to prevent harassment prohibited by law or by this policy is included in employee and student orientations as well as employee in-service training.

This policy is:
- displayed in prominent areas of each division building in a location accessible to students, parents and school personnel,
- included in the student and employee handbooks; and
- sent to parents of all students within 30 (thirty) calendar days of the start of school. Further, all students, and their parents/guardians, and employees are notified annually of the names and contact information of the Compliance Officers.

False Charges

Students or school personnel who knowingly make false charges of harassment shall be subject to disciplinary action.


Adopted:        April 18, 2000

Revised:        January 16, 2001; July 19, 2011; November 20, 2012; June 30, 2015; March 20, 2018

Legal Refs:     20 U.S.C. §§ 1681-1688.
                29 U.S.C. § 794.
                42 U.S.C. §§ 2000d-2000d-7.
                42 U.S.C. §§ 2000e-2000e-17.
                42 U.S.C § 2000ff-1.
                34 C.F.R. 106.9.
                Code of Virginia, 1950 as amended, §§ 22.1-291.4, 2.2-3900, 2.2-3901, 2.2-3902.

File : GBA/JFHA
Page 8

| Cross Refs: | AC | Non-discrimination |
| | AD | Educational Philosophy |
| | GB | Equal Employment Opportunity/Nondiscrimination |
| | GBA-F/JFHA-F | Report of Harassment |
| | GBM | Professional Staff Grievances |
| | GBMA | Support Staff Grievances |
| | JB | Equal Educational Opportunities/Nondiscrimination |
| | JFC | Student Conduct |
| | JFC-R | Standards of Student Conduct |
| | GCPD | Professional Staff Discipline |
| | JHG | Child Abuse and Neglect Reporting |
| | KKA | Service Animals in Public Schools |

# EXHIBIT 12

PETER VLAMING

**WEST POINT SCHOOL BOARD**
West Point, Virginia 23181

**May 22, 2018**
**Appointment Sheet and Salary Statement**

1.  Please be advised that you have been appointed to the position of teacher for the **2018-2019** school session and your planned assignment will be at **WEST POINT HIGH SCHOOL.**

2.  This contract commences on **August 20, 2018** and is in compliance with and subject to the Board of Education Regulations and the 2018-2019 school calendar, as may be amended by the School Board from time to time.

3.  Your salary for next session will be **$52,979** based on **10** years of teaching experience.

4.  *Teachers in a graduate program leading to a Masters degree will qualify for an additional $1000.00 upon completion of 18 semester hours. Six semester hours must be earned each year thereafter to continue eligibility for stipend. A transcript of credits earned must be submitted annually until Masters degree requirements have been completed. Stipends will not be added after September of any contract year. Teachers with a Masters degree will receive $2,000.00.

5.  The salaries of all teachers employed on standard contracts - 10 months will be paid in twelve equal installments September through August. Payday normally in West Point is the last Friday of the month.

6.  The salaries of other professional employees and teachers employed on twelve-month contracts will be paid in twelve equal installments July through June.

7.  Teachers who have attained continuing contract status will not receive another formal contract. Teachers who have not attained continuing contract status will continue to receive annual contracts or a continuing contract when applicable.

8.  It is with pleasure that I inform you of your appointment. Please return one copy of this communication and one signed copy of your contract where applicable.

See other side for special covenants.
Signature: _____    Date: 5/22/2018

Signature: _____    Date: 5-22-18
Clerk of Board

SPECIAL COVENANTS:

1.    The minimum length of this contract shall be 200 days as follows:
      (i)    180 teaching days or 990 instructional hours; and
      (ii)   up to 20 days for activities such as teaching, participating in professional development, planning, evaluating, completing records and reports, participating on committees or in conferences, or such other activities as may be assigned or approved by the local school board.

2.    The actual number of teacher days, workdays, and holidays for certificated personnel will be specified in the school calendar for each year except that the School Board and Superintendent retain authority to revise work days, teaching days, holidays and unassigned days during the school year.

3.    The School Division's policies and regulations will be in effect.

4.    All personnel shall furnish, upon School Board request, as a condition of employment a certificate from a reputable physician certifying that the individual has been examined for tuberculosis and that the results of the examination are negative. All personnel new to the division shall submit a certificate on or before September 30 of the initial year of employment.

5.    Supplements paid for additional duties shall be determined by the School Board annually and personnel affected by same shall be notified prior to the commencement of additional duties for which supplements are allowed.

6.    The School Board and the Superintendent shall determine the length of the school day, the time teachers shall spend at school prior and to and following the actual time that pupils are in school, and other matters relating to the operation of schools.

7.    This contract shall be null, void and unenforceable should the School Board fail to receive, or to continue to receive, funds which, in its sole opinion, are sufficient to meet its obligations hereunder.

8.    A probationary term of service for five years in the same school division shall be required before a teacher is eligible for a continuing contract. Once continuing contract status has been attained in another school division in the Commonwealth, a probationary period not to exceed two years shall be served in this school division.

# COMMONWEALTH OF VIRGINIA



### KING WILLIAM CIRCUIT COURT
Civil Division
351 COURTHOUSE LANE, SUITE 130
KING WILLIAM  VA  23086
(804) 769-4936

Summons

To: WEST POINT SCHOOL BOARD
1626 MAIN STREET
WEST POINT VA 23181

Case No. 101CL19000454-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Friday, September 27, 2019

Clerk of Court: PATRICIA M. NORMAN

by _Patricia M. Norman, Clerk_
(CLERK/DEPUTY CLERK )

Instructions:

Hearing Official:



Attorney's name:       VOYLES, SHAWN A
(757)461-2500

# COMMONWEALTH OF VIRGINIA



KING WILLIAM CIRCUIT COURT
Civil Division
351 COURTHOUSE LANE, SUITE 130
KING WILLIAM  VA  23086
(804) 769-4936

Summons

To: LAURA ABEL
DIVISION SUPERINTENDENT
1626 MAIN ST
WEST POINT VA 23181

Case No.  101CL19000454-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Friday, September 27, 2019

Clerk of Court:  PATRICIA M. NORMAN

by *Patricia M. Norman, Clerk*
_____
(CLERK/~~DEPUTY CLERK~~)

Instructions:

Hearing Official:



Attorney's name:      VOYLES, SHAWN A
(757)461-2500

# COMMONWEALTH OF VIRGINIA



KING WILLIAM CIRCUIT COURT
Civil Division
351 COURTHOUSE LANE, SUITE 130
KING WILLIAM VA 23086
(804) 769-4936

Summons

To: JONATHAN HOCHMAN                        Case No. 101CL19000454-00
    PRINCIPAL OF WEST POINT HS
    2700 MATTAPONI AVE
    WEST POINT VA 23181

The party upon whom this summons and the attached complaint are served is hereby notifie
that unless within 21 days after such service, response is made by filing in the clerk's office
of this court a pleading in writing, in proper legal form, the allegations and charges may be
taken as admitted and the court may enter an order, judgment, or decree against such party
either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Friday, September 27, 2019

Clerk of Court: PATRICIA M. NORMAN

                by  _Patricia M. Norman, Clerk_
                        (CLERK/DEPUTY CLERK)

Instructions:

Hearing Official:                                    

Attorney's name:    VOYLES, SHAWN A
                    (757)461-2500